# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

JOHN PEARL SMITH, II,

               Defendant.

No. 03:16-00086    SLG -DMS

**SMITH'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY AS ARBITRARY AND CAPRICIOUS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

1

<u>MOTION</u>

Comes now, John Pearl Smith, by and through his undersigned counsel, and moves, pursuant to the guarantees of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, for the following relief: An order striking the notice of aggravating factors because 30 years of experience with a federal death penalty ("FDP") has demonstrated that it operates in an arbitrary, capricious, and irrational manner and because the evolving standards of decency that mark the progress of a maturing society render the FPD unconstitutional.

<u>STATEMENT OF THE CASE</u>

John Pearl Smith, II, aged 32, is charged in the District of Alaska by Indictment with murder, under a statute carrying the potential penalty of death. Dkt 102. The Government has filed a Notice of Intent alleging numerous statutory and non-statutory aggravating factors. Dkt. 168. Smith moves to strike the Notice of Intent because death sentences under the Federal Death Penalty Act are arbitrary and capricious and violate the Fifth, Sixth, and Eighth Amendments.

This argument has been made in other recent federal death penalty cases. The Government may argue that the defense is simply restating arguments being made in every federal capital case. But the constitutional infirmities of the federal death penalty do not change: it is arbitrary, capricious, irrational, discriminatory in impact, and does not rationally separate those who should live from those who should die. Although not novel, these arguments demand attention.

2

<u>LEGAL ARGUMENT</u>

POINT ONE:

THIRTY YEARS OF EXPERIENCE WITH A FEDERAL DEATH PENALTY HAS DEMONSTRATED THAT IT OPERATES IN AN ARBITRARY, CAPRICIOUS, IRRATIONAL, AND DISCRIMINATORY MANNER. THIS COURT SHOULD DECLARE THE PENALTY UNCONSTITUTIONAL AND STRIKE THE NOTICE OF INTENT TO SEEK DEATH.

A "modern" federal death penalty has been in effect for 30 years.[1] Over the past quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself as arbitrary, capricious, irrational, discriminatory in impact, and incapable of answering in a rational and predictable way the profound question of who should live and who should die. This Court should strike it down.

In the following pages, the defense presents data and information regarding the numerous problems with the administration of the federal death penalty, including the following: :[2]

- Only a tiny handful of those federal defendants who could face

---

[1] On November 18, 1988, Congress enacted a federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders in the context of drug trafficking. 21 U.S.C. § 848(e). The reach of the federal death penalty was later expanded when, on September 13, 1994, President Clinton signed into law the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 *et seq.* In March 2006, the procedural provisions of the ADAA, 21 U.S.C. §§ 848(g), were repealed. This prosecution is brought under the FDPA.

[2] If the government disputes the accuracy of any of the data underlying this argument, a hearing is requested at which counsel will establish the truth of all factual assertions made in this memorandum.

Case 3:16-cr-00086-SLG   Document 365   Filed 03/01/19   Page 3 of 61

the federal death penalty ever do.

- The theoretically national federal death penalty is, in practice, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the FDPA has consistently and disproportionately targeted members of minority groups.

- Of the few defendants actually targeted for death, nearly half (234/498) have been simply permitted to enter plea agreements that take death off the table.

- Of the cases that proceed to trial, two-thirds of defendants (#/#) are spared the death penalty by juries or judges.

- There has been a sharp drop in the number of cases authorized by the Department of Justice for capital prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of federal death verdicts returned by juries.

- Approximately one-third (#/#) of federal death sentences have been set aside on direct appeal or in proceedings brought under 28 U.S.C. § 2255.

- Although federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for over 25 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.

- In the past 27 years there have been just three federal executions, the most recent of which took place over 12 years ago, a circumstance stripping the FDPA of any valid penalogical purpose.

See Exhibit 1, Declaration of Kevin McNally. A full discussion of the issues follows.

A. **The Constitution demands that statutes authorizing a penalty of death cannot be carried out in an arbitrary and capricious.**

4

In 1972, the United States Supreme Court, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death-penalty schemes (including the then-existing federal penalty) as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972).

The random and capricious imposition of the death penalty is perhaps best captured by the comparison drawn in *Furman* by Justice Stewart between receiving a sentence of death and being struck by lightning. *Furman*, 408 U.S. at 309-10 (Stewart, J., concurring) (citations and footnotes omitted). In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court summarized its holding in Furman:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court had also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." *Furman*, 408 U.S. at 255 (Douglas, J., concurring). Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.
> .

5

408 U.S. at 313 (White, J., concurring). The infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied," 408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." *Id.*

The United States is now a nation of 328 million people. The last time this country carried out 50 or more executions was 2009.  In the 30 years since the return of the federal death penalty, from a universe of thousands of potential federal capital cases, there have been 524 defendants authorized for capital prosecution. Exhibit 1 at 4. It is estimated that the Attorney General authorizes just 13% of the cases potentially eligible for a capital prosecution. Id.  Of the authorized cases, juries have returned 85 death verdicts involving 81 defendants, some of whom were sentenced to death twice after a first death verdict was set aside. Id at 4-5.   Three federal prisoners have been executed.[3] There has not been a

_____

[3] Two federal executions took place in 2001 (Timothy McVeigh and Raul Garza) and one in 2003 (Louis Jones). The McVeigh and Jones executions were carried out

federal execution in 15 years. To reiterate Justice Brennan's observation, "the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system."

State courts have found that modern death penalty schemes continue to operate in arbitrary ways. In October 2018, the Washington State Supreme Court struck down that state's death penalty scheme under the Washington State Constitution. That Court held that Washington's capital punishment law was "intended to fix the problems identified in *Furman,* but after decades of experience, we now see the same fatal flaws emerge, despite the legislative attempt to avoid such deficiencies.' *State v. Gregory*, 427 P.3d 621, 636 (Wash. 2018). Similarly, the Connecticut Supreme Court, employing state and federal constitutional analysis, declared that state's death penalty scheme unconstitutional and specifically as it applied to those serving a sentence of death when the Connecticut legislature repealed capital punishment. *State v. Santiago*, 318 Conn. 1, 122 A.3d 1, (2015). That opinion also relied in part on the rarity with which sentences of death were pursued and imposed. *Id.* at 114.

Also of recent significance is the dissenting opinion filed in 2015 by Justices Breyer and Ginsburg in *Glossip v. Gross*, 135 S. Ct. 2726, 2755-2780 (2015) ("*Glossip* dissent"). Justices Breyer and Ginsburg questioned the continued constitutionality of capital punishment, citing, among other reasons, the increasing rarity of the punishment, its

_____

pursuant to the 1994 federal death penalty; Mr. Garza was executed pursuant to the 1988 enactment. Exhibit 1 at 5-6.

disproportionate racial impact, its regional application, and the arbitrary manner it is sought.

The argument that the federal death penalty should be struck down because it is so infrequently sought or imposed should not be misunderstood as a call for more frequent use of the federal death penalty. As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.
>
> Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one. That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment. No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison. Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible. Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

When *Furman* was decided, 15-20% of convicted murderers and rapists were sentenced to death in those jurisdictions where the death penalty was available for such offenses. *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissenting) (citing four sources to support the statistic). Justice Powell, also dissenting, cited similar statistics. *Id.* at 435 n.19. Justice Stewart utilized Chief Justice Burger's statistical analysis to lend further

8

support to his conclusion that the death penalty was in an Eighth Amendment sense, "unusual."

In *Furman*, arbitrariness and caprice were determined to be inevitable side- effects of a rarely-imposed punishment of death. This view is in harmony with Justice White's observations, premised on his experience reviewing hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). In reflecting on *Furman,* the courts have consistently understood the basis for the decision. In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion). This understanding was repeated in *Woodson v. North Carolina*, *supra*, 428 U.S. at 295, n.31 ("Data compiled on discretionary jury sentencing of persons convicted of capital murder reveal that the penalty of death is generally imposed in less than 20% of the cases.). Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), also reiterated that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed."

9

In its modern iteration, the federal death penalty is sought and imposed far more rarely than in the cases examined in *Furman*. Being sentenced to death in the federal system is akin to being struck by lightning. As argued *infra*, no meaningful basis may be discerned for distinguishing the cases of those sentenced to death from those spared the sentence, even among the most extreme. In 2011, the Death Penalty Information Center published a report, entitled, "Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976" (Death Penalty Information Center Washington, DC 2011). The report catalogues the arguments and collects the data for declaring the scheme of capital punishment practiced in our courts unconstitutional. *See also*, G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty"*,* 85 WASHINGTON LAW REV. 425, 431 (2010) ("The infrequency of the federal death penalty – with 67 federal death sentences in the face of over 150,000 murders – makes death by lightning-strike look positively routine. A federal death sentence is akin to winning (or in this instance losing) the lottery.")

## B. The federal death penalty as actually sought and imposed and what the figures mean.

The current state of the post-*Gregg* federal death penalty, as it has been sought and imposed, is summarized in this table.

### TABLE 1:  THE STATUS AND DISPOSITION OF ALL POTENTIAL FEDERAL CAPITAL CASES  FROM NOVEMBER 1988 TO SEPTEMBER 2018

- Potential cases:                                    4,144

- Pending DOJ review:          ``````````        305

- Defendants authorized for capital prosecution:        520

- Pending or in trial: `````````` 23
- Jury sentences of death: 85
- On federal death row, active death sentence 62
- Executed: 3

See Exhibit 1, Attachment an Excel spreadsheet summary of the outcome of every completed authorized federal capital case since 1988, current as of October 12, 2018.

Subtracting the cases under review, the Department of Justice has authorized local prosecutors to seek the death penalty in approximately 14% (520/3,389) of cases of individual federal defendants charged with death-eligible offenses and therefore potentially exposed to a capital prosecution. In *Furman*, the Court cited the infrequency with which the death penalty was sought and imposed as a circumstance virtually guaranteeing the arbitrary and capricious application of the ultimate penalty. This conclusion was reached based on a showing that, on a nation-wide basis, fewer than 20% of defendants convicted of capital crimes were actually sentenced to death. In the federal system, the figure is lower by a factor of 10. Far fewer than 20% of those eligible for federal capital punishment are even *exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to death. Taking the highest figure for actual death sentences returned against federal defendants by federal juries at 85, approximately 2.0% (85/4,144) of all potentially death-eligible federal defendants—one in fifty—were sentenced to death. In terms of federal executions to date – three – the figure is infinitesimal. This baseline figure includes 23 authorized cases that are pending trial or re-trial. It is reasonable to predict that some those cases will be resolved by plea agreement and that a certain number

11

will proceed to trial, with an overall statistical likelihood of very few resulting in death sentences. It is also reasonable to assume that some of the 62 federal inmates now under an active sentence of death will succeed in appellate or post-conviction challenges to their convictions or sentences.

These figures demonstrate that in decisions reached by juries and judges, even with defendants who qualify as the "worst of the worst" and were therefore targeted for the federal death penalty, life sentences result in two-thirds of the cases that proceed to a penalty-phase. Utilizing an analysis persuasive to the Supreme Court in *Furman,* the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf., Roper v. Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books"); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon"); *see also, Thompson v. Oklahoma*, 487 U.S. 815, 822 n. 7 (1988) (plurality) ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance"). Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. As stated by Circuit Judge Gregory of the Fourth Circuit, dissenting where the federal death penalty was imposed:

12

When the government selects a few offenders from such a large pool for execution, it cannot further its legitimate penalogical interests; instead it merely inflicts gratuitous pain and suffering.

*United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, Cir. J., dissenting). Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the court should strike it down.

C. **The absence of any discernible principled basis for distinguishing cases and crimes where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

The Supreme Court has held that the Constitution will not tolerate sentences of death imposed in a manner that is arbitrary or capricious. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." More recently in *Kennedy v. Louisiana*, *supra*, the Court warned: "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 128 S.Ct. 2650. For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* In practice, the FDP has failed to meet this constitutional standard and operates in an arbitrary and irrational manner. This point was made both in the *Glossip* dissent and in the Connecticut Supreme Court's *Santiago* opinion.

13

An examination of the federal death penalty in operation shows there is no consistency or predictability in the way federal juries (and in three cases, federal judges) have imposed or declined to impose the federal death penalty or which cases may plead out to life terms or less and which proceed to trial. The Federal Death Penalty Resource Counsel Project, described by Mr. McNally in his declaration, Exhibit 1 at 1-3, maintains a compendium of penalty-phase verdict sheets returned in virtually every federal capital case that has proceeded to trial since 1988.[4] The Project website also maintains a summary of the factual circumstances and outcome to hundreds of capital cases, whether tried or not, and much other useful information regarding the federal death penalty.

This argument is not refuted by simply pointing out there are always difficulties inherent in comparing cases. A review of summaries of the cases and the verdict sheets available to this court on line should put that reflexive and simplistic argument to rest. Some examples of the outcomes in federal capital cases follow:

- *United States v. Joseph Sablan and William Guerrero* (CDCA). Two inmates murdered a federal corrections officer at USP/Atwater in 2008. Both had prior murder convictions and were serving life sentences. One defendant had previously murdered a prison guard while serving a sentence in Guam. In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Jessie Con-Ui* (MDPA). Federal inmate, with prior murder conviction and life sentence, murders federal correctional officer at USP/Canaan; murder captured on videotape, over 200 stab wounds inflicted. Defendant convicted and sentenced to life.

- *United States v. Anthony Battle* (NDGA). In 1994 a federal inmate serving a life

_____

[4] The following is a link to those verdict sheets
https://fdprc.capdefnet.org/verdict-forms

14

sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer. Tried, convicted, sentenced to death. Remains on death row 24 years later.

- *United States v. Roy C. Green* (CDCA). In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second. Three other officers were also seriously injured. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Larry Lujan*, (DNM). Lujan was convicted of what the Tenth Circuit described as "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome." *Id.* at 853. These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire . . . . The victims' eleven-year-old daughter discovered the bodies the next afternoon." *Id.* Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future. After the jury could not reach a unanimous verdict, Lujan sentenced to life.

- *United States v. Dzohkhar Tsarnev* (DMA), Boston Marathon bombing case. Police officer and three others murdered, dozens injured, many grievously. Tried, convicted, sentenced to death.

- *United States v. Dylann Storm Roof* (DSC). Murder of 9 African American people during a Bible study service in the basement of the historic Emanuel AME Church in Charleston, SC. Roof was a 21-year-old white supremacist. Tried, convicted, and sentenced to death after representing himself during penalty phase.

- *United States v. Timothy McVeigh* (DCO). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols*, (DCO). McVeigh's co-defendant. Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*, (SDNY).

15

Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. James Matthew Bradley* (WDTX). Driver of tractor-trailer illegally transporting an alleged 100 undocumented immigrants from Laredo, Texas to San Antonio, Texas. Ten people died of heat stroke in the back of the trailer, with outside temperatures over 100 degrees during the 2.5 hour ride. Refrigeration system in the trailer was broken and the people were not provided with water. Negotiated guilty plea for ten life sentences.

- *United States v. Eric Rudolph* (NDAL). The Olympic and abortion-clinic bomber. Victims included a police officer. Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive." Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui* (EDPA). Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski* (EDPA). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner* (DAZ). Mass shooting at public event resulting in 6 deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Antonio Johnson* (WDVA). Defendant indicted for a murder at USP/Lee where he was serving a virtual life sentence when he stabbed another inmate to death. On March 21, 2012 – after DOJ approval of a life plea –Johnson entered a guilty plea.

- *United States v. David Paul Hammer* (MDPA). Prison inmate guilty of strangling to death cellmate at USP/Allenwood. Sentenced to death, but death sentence later vacated. Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll* (MDPA). Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood. Same judge, same courtroom, same defense attorneys as *Hammer*. Sentenced to life.

16

- *United States v. Storey*, (DKS). Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP/Leavenworth. Plea agreement. Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle* (DCO). Inmates at USP/Florence attack two suspected "snitches," one killed, one injured. Plea agreements. Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan* (DCO). Two cousins housed at USP/Florence killed their cellmate, eviscerated his body, hung his entrails around the cell, and, on videotape, displayed the victim's heart and liver to responding officers. Defendants tried separately. Life verdicts in each case.

- *United States v. Barry Mills, et al.* (CDCA). A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders. Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions. After two lengthy trials, juries spared the first four defendants – the alleged leaders of the gang – facing the death penalty and the government withdrew its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Vincent Basciano* (EDNY). Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

- *United States v. Anh The Duong* (NDGA). Duong was previously sentenced to death in California state court for four murders that occurred in a nightclub in 1999. Federal prosecutors indicted Duong in a 29-count, multi-defendant racketeering indictment, alleging three capital homicides (arising out of a string of robberies), and an additional five RICO murders. On December 15, 2010, a federal jury sentenced Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort* (NDGA). Attorney General approved 40year- plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v. Joseph Minerd* (WDPA). Arson/pipebomb murder of pregnant girlfriend, her fetus, and three-year old daughter. Tried, convicted, sentenced to life.

17

- *United States v. Coleman Johnson* (WVA.). Pipebomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean* (DVT). Defendant sent pipebomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

- *United States v. Billy Cooper* (DAZ). Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard* (WDTX). Car-jacking double homicide. Tried, convicted, sentenced to death.

- *United States v. Gary Sampson* (DMA). Two murders during separate car-jackings. Pled guilty, sentenced to death by jury. Later set aside. Again sentenced to death on re-trial.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.). Chinese gang members who kidnaped, raped and murdered victims held for ransom. Fu Xin Chen and Jai Wu Chen entered plea agreements. Attorney General withdrew death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

- *United States v. Louis Jones* (NDTX). Decorated Gulf War veteran with no prior record abducted, raped, and killed young woman soldier. Tried, convicted, sentenced to death, executed.

- *United States v. Chevy Kehoe and Daniel Lee* (WDAR) Triple murder of two adults and small child in connection with activities of white supremacist organization. Tried and convicted together. Kehoe – considered more culpable – sentenced to life. Lee sentenced to death by the same jury.

- *United States v. Michael Jacques* (DVT). Defendant with prior convictions for sexual assaults kidnaped, raped, and murdered 12-year-old niece. Case authorized for federal capital punishment. Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa* (EDNY). Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

18

- *United States v. Trinity Ingle and Jeffrey Paul* (WDAR). Murder of elderly retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle convicted and sentenced to life; Paul convicted and sentenced to death.

- *United States v. Kristen Gilbert* (DMA). VA nurse murdered four patients and attempted to murder three more. Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, (EDPA). Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

- *United States v. Bille Allen and Norris Holder*, (WDMO). Fatal shooting of bank teller during robbery. Tried, convicted, and both defendants sentenced to death.

The randomness of who is sentenced to death and who is allowed to live is particularly striking where – as in Mr. Smith's case – the murder has taken place in the context of drug-dealing.

- *United States v. Azibo Aquart and Azikiwi Aquart*, (DCT). Two brothers charged with three drug-related murders. Azibo tried, convicted, sentenced to death. Azikiwi pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton* (EDPA). Eleven drug-related murders. All three tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford* (EDPA). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff* (SDNY). Fourteen drug-related murders. Plea agreement. Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez* (SDNY) Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (SDNY). Execution-style triple murder by father and son. Tried, convicted, sentenced to life.

19

- *United States v. Thomas Pitera* (EDNY). Nine drug-related murders in organized crime and large-scale drug trafficking context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz* (WDMO). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

- *United States v. John Bass* (EDMI). Four drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore* (DDC). Thirty-one drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson* (NDIL). Two drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Peter Rollock* (SDNY). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

- *United States v. Tommy Edelin*, (DDC). Fourteen drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal* (EDTX). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson* (EDPA). Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza* (SDTX). Three drug-related murders. Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis* (EDPA). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Emile Dixon* (EDNY). Two drug-related murders, including machine-gunning death of suspected informant. Tried, convicted, sentenced to life.

20

- *United States v. Anthony Jones* (DMD). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker* (NDNY). Two defendants killed a drug-dealer and fled to New York City where, in a failed effort to steal a car, they shot and killed a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years-old. Both defendants tried, convicted, sentenced to life.

These are just selected cases from the larger pool of potential and authorized federal capital cases. This argument draws further force from the cumulative effect gained from reviewing the summaries of authorized cases compiled by the Federal Death Penalty Resource Counsel Project and the verdict sheets on-line. Since these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the "worst of the worst" the federal system has to offer. It is likely there is not a crime on the list on which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – in the overwhelming *majority* of such cases – juries (and in three instances judges) returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

One cannot read these chronicles of the many ways man can demonstrate his inhumanity to his fellow man without realizing that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for

21

indiscernible reasons, some defendants were sentenced to death, while an overwhelming majority were not.[5]

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness. In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*. If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

B. Sarma, "*Furman's* Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill *Furman's* Promise," 2009 CARDOZO L. REV. DE NOVO 238, 242 (2009). Mr. Smith urges this court to strike down the death penalty for the above stated reasons.

### D. The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in targeting minority defendants and a demonstrated race/gender-of-victim effect.

1. <u>Introduction</u>.

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious

---

[5] If any basis can be discerned, it is, as the following discussion illustrates, race, region, and gender, none of which are permissible criteria for selecting defendants for capital punishment.

22

role of race; the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

The grossly disproportionate racial targeting of racial minorities for federal capital prosecution has remained unchanged for 30 years. By 1994—barely six years after the return of a "modern" federal death penalty—obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights investigated and concluded:

> Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on The Judiciary, 103rd Congress, 2nd Session, March 1994. That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87 per cent) were black or Hispanic. *Id.* Presently the figure is 71 per cent, hardly an "improvement" to boast of. (A13.)

Earlier evidence of the potential race-effect of the death penalty had been examined by the agency formerly known as the General Accounting Office (now the Government Accountability Office). When Congress enacted the § 848(e) (ADAA) death penalty, the

23

GAO was directed to study the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2) (Repealed). The GAO undertook that study in 1990 and concluded:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks. This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques. The finding held for high, medium, and low quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-57, Feb. 1990) at p. 5. In a 1999 law review article, Professor Rory Little, writing from the perspective of one who had served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. R.K. Little, *The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Roles,* 26 FORDHAM URBAN L.J. 347 (1999) at 450-90.

From the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematical. This shameful pattern remains in place. Two-thirds of the defendants authorized for a federal capital prosecution are members of minority groups.

The remedy cannot be, however, to target white defendants for federal death penalty prosecutions. Race is to play no part in the selection of who should live and who should die. The remedy is to strike down the FDPA and its unconscionable application.

24

2.     The 2000 DOJ Study.

On September 12, 2000, the Department of Justice released the comprehensive study detailing how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000. The essence of the 2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. The Study reported that federal death row consisted of nineteen men, of whom four were white, thirteen black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row had been sentenced to death in the South. Virginia and Texas had each contributed four defendants to federal death row. At the time of the Study's release, no other federal jurisdiction had sentenced more than a single defendant to death.

In terms of which defendants faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%). *See* Table 1A at p. T-2 of DOJ Study. As of the summer of 2000, over 70% of the federal defendants targeted for the death penalty had been non-whites.

Besides the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty. The DOJ Study revealed the following on regional disparity:

    •     From 1995 onward, of the 94 separate federal districts in the federal system,

25

only 49 had ever submitted a case recommending capital prosecution. (DOJ Study at 14.)

The DOJ Report noted additionally that the recommendation that accompanies a submission is important. In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General. DOJ Study at 43. In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General. *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000. In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively requested capital-authorization. The approval rate was 90%. DOJ Study at 10.

    3.   <u>The persistent capricious circumstance of region</u>.

As to the regional bias of federal capital prosecutions, the FDPA remains a largely Southern phenomenon. Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states of the former Confederacy. And these states sentence federal defendants to death at a higher rate than elsewhere in the country.

<u>**TABLE 2: 1988-2018**</u>

<u>**STATES WITH MORE THAN ONE**</u>
<u>**FEDERAL DEATH VERDICT**</u>

Texas —16
Missouri—10
Virginia—8
Louisiana—4
North Carolina—4

26

South Carolina—3
Georgia—3
Oklahoma—3
Maryland—2
Pennsylvania—2
Arkansas—2
California—2
Florida—2
Illinois—2
Iowa—2
New York—2
Massachusetts—2
West Virginia—2

See Exhibit 1 and Attachments. Alaska has never had a federal capital trial.

The next table summarizes the chances of receiving a death sentence by the happenstance of the circuit in which the case is tried.

## TABLE 3

## DEATH SENTENCING RATE BY CIRCUIT

| CIRCUIT | DEFENDANTS TRIED | DEATH SENTENCED | RATE |
|---------|------------------|-----------------|------|
| FIRST | 12 | 2 | 17% |
| SECOND | 31 | 3 | 10% |
| THIRD | 18 | 2 | 11% |
| FOURTH | 72 | 15 | 21% |
| FIFTH | 31 | 21 | 68% |
| SIXTH | 19 | 3 | 19% |
| SEVENTH | 9 | 3 | 33% |
| EIGHTH | 32 | 15 | 47% |
| NINTH | 11 | 4 | 18% |
| TENTH | 18 | 5 | 28% |
| ELEVENTH | 20 | 6 | 30% |
| D.C. | 3 | 0 | 0% |

*Id.*

27

It should go without saying that a sentence of death should not depend on where a federal prosecution is brought. This is the essence of an Eighth Amendment claim of the arbitrary and capricious infliction of the ultimate punishment.

In federal death verdicts and the confederacy[6] (the number of federal executions– three–is too low to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas) shows that 49 of 81 federal death verdicts have come out of the states that formed the confederacy, over 62% of all federal capital verdicts. Just three of those former confederate states – Texas, Missouri and Virginia – account for 32 federal death verdicts, 40 per cent of the total.[7]

When one examines the numbers on a circuit basis, the results reflect the same regional bias. If we have a national death penalty it should not matter whether you are tried in Texas or New York or Hawaii in terms of the likelihood of receiving a death sentence. But that very much is the reality.

Historically, the death penalty has been a largely Southern phenomenon; that remains the case today. As of November 2, 2018, there have been 1,485 post-*Gregg* executions carried out in the United States. Of these, 1,212 – or 82% – have been carried out by

---

[6] The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

[7] A recent study conducted by the Death Penalty Information Center concluded that more than half of this nation's *post-Furman* executions came as a result of cases prosecuted in two per cent of the nation's counties. *See* "The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous costs to All" (Death Penalty Information center 2013).

28

Southern states. Five states alone – Texas, Oklahoma, Virginia, Missouri and Florida – have accounted for 962 executions, substantially more than half (67%) of all post-*Gregg* executions. *Id.* With this historical perspective in mind, not surprisingly, those federal jurisdictions in states with an established "culture of death"—often with a history of *de facto* and *de jure* racial discrimination and slavery —reflect that culture, consciously or not, in decisions to pursue the death penalty. Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same. Regional bias, however, is inimical to a national penalty that is, theoretically at least, that sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in each case.

The "ideal" of a national standard aside, the federal death penalty well into 2018 continues to be a Southern phenomenon and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts. Thus, "[o]f the 85 federal death sentences imposed by juries since 1988, 55 [65%] have come from the traditional 'death belt' states, the states that have historically executed the most people." Exhibit 1 at 7. In a study published in 2010, the authors noted:

> Geographic disparities . . . persist. To promote uniformity,
> United States Attorneys submit all death-eligible federal cases
> to the United States Attorney General for death-authorization.
> Yet the geography of the federal death penalty is anything but
> uniform. Six of the ninety-four federal judicial districts account

29

> for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 WASHINGTON L. REV. 425, 429-430 (2010). As of 2015, 25% of the 94 federal districts have *never* had an authorized federal capital case. (A100.) The reality is there has been no appreciable change since the 2000 DOJ Study, and the federal death penalty remains a disproportionately and distinctly regional phenomenon. It appears – whether one takes a micro or macro view – that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed. This is the essence of arbitrariness and caprice.

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See Bush v. Gore*, 531 U.S. 98, 106 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment").

4.  <u>The continuing and unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty</u>.

30

After more than 25 years of a federal death penalty, it is undeniable and clear that the patterns of race and region that disturbed and troubled government officials 15 years ago persist. It seems undeniable these problems are intractable and part of the DNA of capital punishment, including the federal version. These tables reflect the present state of affairs:

### TABLE 4

THE RACE OF THE 520 FEDERAL DEFENDANTS
TARGETED FOR FEDERAL EXECUTION 1988-2018

| RACE OF DEFENDANT | NUMBER | PER CENTAGE |
|---|---|---|
| African-American | 258 | 49% |
| Caucasian | 139 | 27% |
| Latino | 97 | 19% |
| "Other" | 26 | 5% |

Exhibit 1 at 13.

As Table 4 demonstrates, in terms of targeting decisions, 81% of those selected for capital prosecutions are members of minority groups. At the time of the 2000 DOJ Study, the figure was 70%. As the pie chart on the following page demonstrates, the disproportionate targeting of minorities for the federal death penalty has had what would be the expected effect on the population of death row. As of the fall of 2018, 60 percent of those on federal death row are non-white. This is unacceptable that should be a source of intense concern to the Justice Department. The chart here reproduced would have looked the same in the year 2000.

31



**RACIAL COMPOSITION OF FEDERAL DEATH ROW (OCTOBER 2018)**

- 2%
- 2%
- 11%
- 43%
- 42%

White
African-American
Latino
Asian
Native American

    (a)    *The law on race and the death penalty.*

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan, Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death and what would factor into that process. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense

32

counsel would have to level with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Brennan, Marshall, Blackmun and Stevens, J.J., dissenting). In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans. One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287. More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Id.* at 373-74.

In the United States, capital punishment and race have always been intertwined. That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. REV. 1591 (2004); K. McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets*

33

*Worse*, 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, *Black Man's Burden: Race and the Death Penalty in America*, 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 OREGON L.REV. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty*, 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, *Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction*, 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 RUTGERS L.REV. 27, 100-57 (1988).

. The Supreme Court of the State of Washington reached the same conclusion, invalidating its capital-punishment statute on a finding that jurors in that state were three times more likely to reach a death verdict in a case involving a black defendant than for a white defendant in a similar case. *State v. Gregory*, 2018 Wash. LEXIS 696 (October 11, 2018).

In *Furman*, Justice Douglas had explored the ugly correlation between race and the death penalty and concluded:

> In a Nation committed to equal protection of the laws there is no permissible "caste" aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position. In ancient Hindu law, a Brahman was exempt from capital punishment, and in those days, "[g]enerally, in the law books, punishment increased in severity as social status

34

> diminished." We have, I fear, taken in practice the same position .
> . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring) (footnotes omitted). DPIC reports that since executions resumed in the wake of *Gregg*, there have been 20 executions of a white defendant for killing a black victim, but there have been 288 executions of black defendants for killing a white victim. (A83.)

This is enough to establish a case of impermissible racial disparity in the enforcement of the federal death penalty. It is difficult to imagine how, other than racism, one can explain the way the federal death penalty has been administered in terms of the race of those who are targeted. *See, Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). This case, as a federal prosecution, is subject to the Due Process Clause of the Fifth Amendment long held to embody a guarantee of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment"). In criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . .

35

of combating racial discrimination." *Id.* at 558. That the federal death penalty operates with an impermissible racist effect is powerful evidence it operates unfairly and with arbitrariness and caprice. Mr. Smith has standing under the Eighth Amendment and Fifth Amendment Due Process Clause not to be subjected to an arbitrary system of capital punishment.

There is strong and consistent evidence that minority defendants are often more likely than white defendants to face the death penalty at the hands of the federal government. This demands our government's "most rigid scrutiny" of the kind described in *Loving*. The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments. *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Second, racial discrimination is a species of the arbitrariness condemned in *Furman*. This is apparent from the opinions of the Justices in the majority and of those in dissent.

36

For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and ran directly counter to "the desire for equality . . . reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-366 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J., dissenting); *id.* at 449-50 (Powell, J., dissenting). Later Supreme Court cases have applied this interpretation. For example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman* would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant." 462 U.S. at 885.

(b)     <em>The effect of race and gender of victim in applying the FDPA.</em>

For obvious reasons, a capital punishment scheme which explicitly provided that the death penalty is more appropriate where the victim is white or white and female would not be constitutional. A scheme that operates in practice to the same effect is no better. On the question of race-of-victim, research that is consistent across several decades has demonstrated those who kill whites are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups. A race-of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system. In their *Glossip* dissent, Justices Breyer and Ginsburg noted, "Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty." *Glossip* dissent, 135

37

S.Ct. at 2760. The dissenting justices also noted that "[M]any studies have found that the gender of the victim makes a not- otherwise-warranted difference." *Id.* at 2761.[8]

Recent studies have demonstrated there is a gender-based irrationality to capital punishment schemes, with the net effect those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males.[9] This is further evidence of the arbitrary, capricious and

_____

[8] For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, "Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," 53 DEPAUL L. REV. 1411, 1423-1428 (2004). Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83% range, while whites were victims of murder in only approximately 45% of such cases. *Id* at 1423. *See also,* K. McNally, "Race and the Federal Death Penalty: A Non-existent Problem Gets Worse," 53 DEPAUL L. REV. 1615 (2004).[28] The dissenters cited the following law review article which had synthesized more than 20 studies conducted between 1990 and 2013, all reaching the same conclusion, *i.e.*, that the race of the victim is a significant factor in which defendants receive the death penalty with those who kill whites significantly more likely to be sentenced to die. Shatz & Dalton, "Challenging the Death Penalty With Statistics: *Furman, McCleskey,* and a Single County Case," 34 CARDOZO L.REV. 1227, 1245-12551 (2013).

[9] Studies of state capital schemes have uniformly detected a significant race- of-victim effect. *See, e.g.* Marcia Wilson, "The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: an Empirical Analysis", 38 N.M. L. REV. 255, 260 (2009) ("The data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die."); State Bar of New Mexico, Task Force on the Administration of the Death Penalty in New Mexico: Final Report (2004) p. 13 ("[S]ome states have done studies in an effort to determine what factors make it more or less likely that an individual defendant will receive the death penalty. These studies have found that the race of the defendant and the race of the victim affect to a significant degree whether a particular defendant convicted of first-degree murder will be sentenced to die.") See also, Pierce and Radelet, "Death Sentencing in East Baton Rouge Parish, 1990-2008", 71 LOUISIANA LAW REV. 671 (2011) (In Louisiana, the odds of a death sentence were 97 % higher for those whose
victim was white than for those whose victim was black.); G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty", 85 WASHINGTON LAW REV. 425, 428 (2010) ("Statistics suggest that defendants are more likely to be sentenced to death for killing a white victim than a black victim."); R. Paternoster, G. Pierce, & M. Radelet, "Race

38

biased nature of the death penalty. This is of particular concern in Mr. Smith's case because one victim is a white female.

Because of these studies "[d]eath row's racial disparity, however, is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." *See* J. Blume, T. Eisenberg, and M. T. Wells, "Explaining Death Row's Population and Racial Composition," 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 1, 167 (March 2004).

Although the significance of the victim's race in death sentencing outcomes has been discussed for at least 40 years, little prior research has examined whether the combined effect of victim race and gender improperly skews sentencing outcomes in capital cases. This area has only recently gained the attention of researchers. Research has identified just three empirical studies, all very recent, that considered the joint effects of victim race

---

and Death Sentencing in Georgia, 1989-1998, in "American Bar Association: Evaluating Fairness And Accuracy In State Death Penalty Systems: The Georgia Death Penalty Assessment Report," (with respect to capital prosecutions in Georgia, "[t]he data show that among all homicides with known suspects, those suspected of killing whites are 4.56 times as likely to be sentenced to death as those who are suspected of killing blacks"); Andrew Welsh-Huggins, "Death Penalty Unequal-Study: Race, Geography Can Make a Difference," *The Cincinnati Enquirer* (May 7, 2005) (analysis of death penalty verdicts in the state of Ohio from 1981 to 2002 reveals that "[o]ffenders facing a death penalty charge for killing a white person were twice as likely to go to death row [compared to those charged with having] killed a black victim. Death sentences were handed down in 18 percent of cases in which the victims were white, compared with 8.5 percent of cases when victims were black"); G.L. Pierce & M. Radelet, "The Impact of Legally Inappropriate Factors on Death Sentencing in California Homicides," 46 SANTA CLARA L. REV.1 (2005), noting that the killers of whites were over three times more likely to be sentenced to death than those who killed blacks and 4 times as likely than those who killed Latinos.

39

and gender in capital prosecutions. Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present.[10] A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases spanning the two decades from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination. See Hindson, Potter and Radelet, "Race, Gender, Region and Death Sentencing in Colorado, 1980- 1999," 77 COL. L. REV. 549 (2006). A November 2007 study analyzed state court data from Georgia cases in the 1970's and concluded:

> Defendants who murder females are more likely to receive a death sentence than defendants who murder males. Furthermore, we show that large differences exist in the likelihood of receiving a death sentence when the variables "victim race" and "victim gender" are considered jointly. Cases that involve white female victims are treated the most harshly .
> . . ."

Williams, DeMuth, Holcomb, 45 CRIMINOLOGY 885. In a 2004 Ohio study, the same research group found that death sentences were a product of a strong association between one victim race-gender group – white female victims – and imposing a death sentence. Holcomb, Williams, DeMuth, "White Female Victims and Death Penalty Research," 21 *Justice Quarterly* 877-902 (2004).

---

10    As noted earlier, in the *Glossip* dissent, it was observed, that "[M]any studies have found that the gender of the victim makes a not- otherwise- warranted difference." *Glossip*, 135 S.Ct. at 2761.

In December 2008, the defendants in *United States v. Valerie Friend and George Lecco*, 05-cr-00107 (S.D.W.Va.), a case involving the murder of a white female victim, moved to bar the death penalty based on an asserted arbitrary and discriminatory victim-related race and gender effect  Based on an analysis of over 400 authorized federal capital cases, it was determined by a qualified expert statistician, Lauren Cohen Bell, Ph.D., that defendants in federal capital cases whose victims were over three times as likely to be sentenced to death than other federal capital defendants. Exhibit 1. This  finding was "highly statistically significant, systemic, and not the result of chance."  The examination revealed, that as of December 2007, federal capital cases involving white female victims constituted 43% (26 of 61) of those sentenced to death in the federal system, but only 9% (61/626) of all potential defendants since 2000.  The death-sentencing rate is many times higher than the death-sentencing rate for non-white female victim cases.

This Court should find that the existence of a "white female victim" effect renders any death sentence in this case presumptively unconstitutional and/or in violation of 18 U.S.C. §§3593(f).

### E.  Conclusion: the federal death penalty experiment has failed.

In their *Glossip* dissent, Justices Breyer and Ginsburg reviewed numerous rigorous studies of the death penalty and summarized the results :

> Thus, whether one looks at research indicating that irrelevant or improper factors – such as race, gender, local geography, and resources – *do* significantly determine who receives a death sentence, or whether one looks at research indicating that proper factors – such as egregiousness – do *not* determine who receive the death penalty, the legal conclusion must be the same: The

41

> research strongly suggests that the death penalty is imposed
> arbitrarily.

*Glossip* dissent, 135 S.Ct. at 2762. The federal death penalty suffers from the same flaws. The federal experiment is a failure and should be declared unconstitutional. The process should begin with a decision from this court dismissing the death-notice . Alternatively, this court should conduct a hearing at which time a full and searching inquiry of the data presented here can take place, to determine whether there is a convincing and constitutionally-sufficient justification for the past, current, and apparently enduring and irremediable, arbitrary, cruel, invidious, and patently cruel and unusual state of the federal death penalty.

POINT TWO

"THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY" HAVE RENDERED THE FEDERAL DEATH PENALTY INVALID AS BOTH CRUEL AND UNUSUAL IN VIOLATION OF THE UNITED STATES CONSTITUTION.

The "evolving standards of decency that mark the progress of a maturing society" have reached that point where the federal death penalty is out of place with current societal values. In Point One, counsel pointed out the arbitrary, capricious, irrational, and invidious manner in which the FDP operates in practice. The same historical state of affairs that existed during *Furman* still leave the FDP constitutionally infirm, but the evolution of standards since *Furman* also make the FDP unconstitutional. Society's acceptance of a death penalty has waned to where present standards of decency decree an end to capital punishment.

Justices Breyer and Ginsburg in their *Glossip* dissent, made four essential points:

1. The death penalty is "cruel" in the Eighth Amendment sense because it is not reliably applied. 135 S.Ct. at 2756-2759.

2. The death penalty is "cruel" in the Eighth Amendment sense because it is imposed in an arbitrary manner and without the reasonable consistency required by the Eighth Amendment and is further marred by the irrational circumstance of region and the invidious circumstance of race. 135 S.Ct. at 2759-2764.

3. The death penalty is "cruel" in the Eighth Amendment sense because of the excessive delays between imposing a death sentence and its carrying out, a necessary byproduct of the care with which such sentences are reviewed. 135 S.Ct. at 2764-2772.

43

4. The death penalty is "unusual" in the Eighth Amendment sense because the imposition and implementation of the death penalty is becoming increasingly rare. 135 S.Ct. at 2772-2780.

Each circumstance described in the *Glossip* dissent is present in the federal death penalty.

In assessing the extent to which society's standards evolve, the courts have clarified that it is the *direction* in which the trend is moving rather than arrival at a final destination. In *Santiago*, *supra*:

> We first take this opportunity to clarify that, although a sudden sea change in public opinion would be sufficient to demonstrate a constitutionally significant shift in contemporary standards of decency, such a dramatic shift is not necessary for us to recognize that a punishment has become repugnant to the state constitution. If the legally salient metaphor is *evolution* of our standards of decency, then a gradual but inexorable extinction may be as significant as the sociological equivalent of the meteor that, it is believed, suddenly ended the reign of the dinosaurs.

*State v. Santiago*, 318 Conn. 1, at 51. In *Roper v. Simmons*, 543 U.S. 551 (2005), the Court explained that in deciding whether the death penalty could be applied to those under the age of 18, "it is not so much the number of States [abolishing the practice], but the consistency of the direction of change."

In reviewing a claim that societal standards of decency have evolved, courts look to five basic factors: (1) the historical development of the punishment; (2) legislative actions; (3) the current practices of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions and (5) the opinion and recommendation of professional associations. *See, e.g., Graham v. Florida,* 560 U.S. 48, 61-67 (2010); *Atkins v. Virginia*, 536 U.S. 304, 311-16 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 830 (1988); *Enmund v. Florida*, 458 U.S. 782, 788-89

44

(1982). This requires a larger context than simply looking at how these principles apply to the federal death penalty, just as an examination of a single state's experience with the death penalty (Texas vs. Wisconsin, for example) would fail to address the necessarily broader point. However, the federal death penalty, as will be shown, falls short on the important issue of how it is reflected in the practices of prosecutors and juries.

On a nationwide basis, as documented in the *Glossip* dissent, there has been a sharp decline in the numbers of death sentences returned by juries and death sentences carried out by the states. (*See* graph at A15.) From a high of 98 executions in 1999, the number has declined steadily to 35 executions in 2014 and 25 executions in 2018. This year is likely to set or match a new benchmark for fewest executions annually since the historical high in 1999. Exhibit at 15. In the federal system, there have been only three executions since 1988. There have been none since 2003. In nation-wide death sentences returned by juries, that figure has also declined precipitously. From a high in 1999 of 279 death sentences, the figure has dropped by nearly 85 per cent to 39, nation-wide, in 2017.

In the regional nature of the death penalty nationwide, that point has been made earlier in this brief that both the death penalty in general and the federal death penalty are largely unknown outside the south. These three charts illustrate this sharp decline in federal authorizations, federal trials, and federal death sentences.

45



AUTHORIZED FEDERAL CAPITAL DEFENDANTS
BY CALENDAR YEAR – 10/12/18

46





47

What these charts document is the dramatic fading away of the federal death penalty from its "heyday" in 2003 when 49 defendants were authorized for a federal capital prosecution to 2014 when just four defendants were authorized. In 2005, 32 federal defendants stood trial in capital cases. In 2018 there were two such trials. In 2009, there were nine defendants sentenced to death. In 2018 there were two.

Where a particular penalty ceases to serve a valid penalogical purpose it is excessive. *Gregg v. Georgia*, 428 U.S. at 183 (joint opinion of Justices Stewart and Powell). As detailed in the *Glossip* dissent, if any basis for a death penalty can be identified it is for deterrence and retribution. *Glossip dissent*, 135 S.Ct. at 2767. However, where sentences of death are imposed with increasing rarity and the number of executions falls, neither purpose is met.

The federal death penalty is unconstitutional in all cases, and as applied to Mr. Smith, because: (1) the death penalty is racist; (2) the death penalty has, and inevitably will, lead to the execution of innocent people; (3) the process by which individuals are selected for capital prosecution vests an unacceptable level of unreviewable discretion in prosecuting authorities, producing irreconcilable inconsistencies; (4) there is no principled basis for distinguishing between defendants sentenced to death from defendants who are not; and (5), evolving standards of decency have reached the point where this court can declare that the death penalty contradicts the values embodied in the Eighth Amendment.

In *Callins v. Collins, supra,* the late Justice Blackmun, four months prior to his retirement from the Court, dissented from the denial of *certiorari* in a Texas death-penalty case and expressed at great length why his 20 years of experience on the Supreme Court had convinced him this nation's death penalty schemes – even if theoretically

48

permissible and constitutional – were, in practice and reality, incapable of fair and even-handed application and therefore retain many of the arbitrary and capricious features, including race, ostensibly struck down in *Furman* and "corrected" by *Gregg* and its progeny. Justice Blackmun stated:

> From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored – indeed, I have struggled – along with a majority of this Court, to develop procedural and substantive rules that would lend more than the appearance of fairness to the death penalty endeavor.
>
> Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved, I feel morally and intellectually obligated simply to conclude that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question – does the system accurately and consistently determine which defendants "deserve" to die? – cannot be answered in the affirmative. It is not simply that the Court has allowed vague aggravating circumstances to be employed [citation omitted], relevant mitigating evidence to be disregarded [citation omitted], and vital judicial review to be blocked [citation omitted]. The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

510 U.S. at 1145-46.

In a 1995 *en banc* opinion from the Third Circuit, reviewing sentences of death imposed in Delaware, Circuit Judge Lewis, joined by Circuit Judges Mansmann and present Chief Judge McKee, expressed agreement with Justice Blackmun's conclusions:

> Although I have concluded that the errors in both trials were not harmless and would, accordingly, reverse the death sentences as to both Bailey and Flamer and remand for reweighing, the

49

tortuous analytical route it has taken both the majority and me to set out our respective views in these cases compels me to add that I believe they perfectly illustrate – perhaps epitomize – why, in the words of Justice Blackmun, we should "no longer tinker with the machinery of death." See *Callins v. Collins*, 127 L. Ed. 2d 435, 114 S. Ct. 1127 (Blackmun, J., dissenting).

To be sure, Justice Blackmun was correct. I realize that I sit on a court charged with the responsibility of applying the law as it is interpreted by the Supreme Court, and in circumstances such as these, by the highest court of a state. That is precisely what the majority and I have sought to do, despite our disagreement. But sometimes, it becomes appropriate for a judge to reflect upon the law that he or she is called upon to apply, and to express views, genuine and unfeigned, that reveal a sincere and earnest belief. And in doing so here, I can only say that more than any I have seen, these cases exemplify the extent to which death penalty jurisprudence has become so complex and theoretically abstract that the only way to try to understand the reasons for and impact of its many subtle distinctions is to resort to carefully crafted hypotheticals. Something is terribly wrong when a body of law upon which we rely to determine who lives and who dies can no longer, in reality, reasonably and logically be comprehended and applied; when, in examining a statutory scheme and analyzing instructions and interrogatories, we are left to reach conclusions by piling nuance upon nuance; when we cannot even agree upon the appropriate standard of review in cases in which lives hang in the balance. Yet this is how cluttered and confusing our nation's effort to exact the ultimate punishment has become. This cannot be what certain fundamental principles of liberty and due process embodied in our Constitution, principles upon which I need not elaborate here, are all about.

It does not dilute my profound respect for the highest court in the land, an admiration and honor that knows no bounds, to voice an apprehension, sincerely felt, that much more guidance in this serious moral dilemma must be forthcoming. Elusive and complicated distinctions, replete with incomprehensible subtleties of the highest order, must not be the talisman that decides whether one should live or die. Until this guidance is forthcoming, the plaintive voice of Justice Blackmun, truly crying in the wilderness, should continue to haunt and remind us that "the desired level of fairness has [not] been achieved."

50

*Flamer v. Delaware,* 68 F.3d 736, 772 (3d Cir. 1995) (*en banc*) (Lewis, Cir. J., dissenting).

The federal death penalty is arbitrary in the sense it is rarely sought or imposed, is not imposed consistently or predictably, and is almost never carried out. Its arbitrariness is further apparent in the regional, racial and gender biases that are clear and present. The federal death penalty operates in an invidious manner because it disproportionately targets members of minority groups for capital prosecution and elevates the status of victims by race and gender. Its very rareness strips the federal death penalty of any valid penalogical purpose. That there are federal inmates who have now been on federal death row for nearly three decades since their crimes since their sentence of death further erodes its legitimacy as a valid exercise of governmental power.

Our standards of decency have evolved to where the federal death penalty no longer serves a valid governmental purpose and lacks a justification or rationale. This court should strike it down.

## POINT THREE

**THE FPDA FAILS TO PROVIDE A STRUCTURE WHICH PERMITS JURORS TO MAKE A REASONED CHOICE BETWEEN A SENTENCE OF LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE AND EXECUTION.**

The FDPA has created a scheme that mixes concepts, burdens of proof, ideals of justice and mercy, and then folds this conglomerate into a process likely incomprehensible to jurors. In the penalty phase of the trial, 12 jurors indoctrinated in the traditional culture of unanimity would be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, would be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors. Jurors would be expected to follow a non-unanimity requirement with regard to the existence of each mitigating factor. Jurors would be expected to segregate the mental state threshold factors from aggravating and mitigating factors, but would then be barred from considering these matters in the weighing process because they are not aggravating factors. Jurors would be asked to determine at what point aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death. It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this complex mélange of concepts and come out with an understanding of the process or a principled verdict. This substantial risk of

52

confusion renders the FDPA unconstitutional. The FDPA has returned the process to an era of unguided discretion.

Because death is qualitatively different from other forms of punishment, courts have long recognized that death cases demand a greater need for a reliable process.. *E.g., Woodson v. North Carolina*, 428 U.S. at 303-305. The Eighth and Fourteenth Amendments require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). For a jury's decision to impose a death sentence to withstand Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia*, 446 U.S. at 427.

Study after study shows that jurors, no matter how sincere and well-intentioned, misunderstand what they are supposed to do during the penalty-phase of a death penalty trial. One such study was detailed in C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 JOURNAL OF SOCIAL ISSUES 149- 176 (1994). The

authors interviewed 57 capital jurors from 19 death penalty trials conducted under a California system very similar to the FDPA construct. The study found the following:

- One third of the jurors sampled focused solely on the nature of the crime itself in the penalty phase discussion in a way that essentially created a presumption of death;

- For many jurors, the absence of mitigation was the only reason given for imposing a death sentence, shifting the burden to the accused;

- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;

- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric in the instructions, indicating a failure to understand what constituted mitigating evidence;

- 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime;

- 60% of the sampled jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

- Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and

- 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly comprehensive misunderstanding of the sentencing mission in general and of the role of mitigation among jurors deciding death penalty cases. *See, e.g.,* C. Haney and M. Lynch, *Comprehending Life*

54

*and Death Matters: A Preliminary Study of California's Capital Penalty Instructions,*18 LAW AND HUMAN BEHAVIOR 411-436 (1994); *Dictionaries and Death: Do Capital Jurors Understand Mitigation?,* UTAH L. REV. 1 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances,* 16 LAW AND HUMAN BEHAVIOR 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda,* 16 LAW AND HUMAN BEHAVIOR 185 (1992).

Juries in actual death penalty cases often believe, completely erroneously, that once an aggravating factor has been found, death is mandatory. *See, e.g.,* U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse,* 66 BROOKLYN L.REV. 1011, 1031-41 (2001).[70] Statistically valid surveys of capital-case jurors who served on actual capital cases overwhelmingly, and with no peer-reviewed research to the contrary, establish the disturbing extent of confusion by jurors making life and death decisions.

The studies demonstrate that a substantial number of jurors who actually serve on capital cases *automatically* vote for death if the defendant is found guilty of murder. *See, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials,* 15 AM. J. CRIM. L. 1, 41 (1989), ("A significant number of jurors in death penalty cases believed that the death penalty was mandatory or presumed for first degree murder" . . . "In the cases in which the jury recommended death, over half of the jurors believed that death was to

55

be the punishment for first degree murder, or at least that death was to be presumed appropriate unless defendant could persuade the jury otherwise"); S.P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 COLUMBIA L.REV. 1538 (1998) ("Many jurors wrongly think they must return a death sentence if they find the defendant's crime was especially heinous, or the defendant is especially likely to present a risk of future danger"); T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data"); W. S. Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings*, 70 IND.L.J. 1043, 1091, n. 32 (1995) ("Many jurors believe that the death penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 CORNELL L. REV. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt justifies the death penalty); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 12; 38, *n.* 12 (1992) ("There is a 'presumption of death'"):

> [Our] data suggest that the sentencing phase of a capital trial commences with a substantial bias in favor of death. This is not in and of itself an indictment of the death trial phase. But the tilt towards death suggests that a defendant with a confused jury may receive the death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life.

56

*Id.* at 38 *n.* 12. These and other studies show that jurors in death penalty cases often misunderstand what they are permitted to consider, and that instructions rarely cure the misunderstandings.

The Capital Jury Project conducted the most comprehensive study on the actual means by which death sentences are meted out. The Capital Jury Project ("CJP") is a consortium of studies of the methods of death penalty juries over a long period. Supported by the National Science Foundation, the CJP had, by 2003, interviewed 1201 members of 354 different juries sitting in death penalty cases in 14 states. *See* W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. LAW BULLETIN 51 (2003). Those findings include the propensity (over 50% of the time) by juries to decide the penalty issues before the penalty phase begins, so the jurors never allow mitigation into their deliberations; a comprehensive lack of understanding of what constitutes mitigation and how it applies; a broad-based lack of understanding of the instructions given by the judge; and that the jury decision-making process in death penalty cases is so flawed that it violates constitutional principles. For example, the CJP's comprehensive, on-the-ground research demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped these critical features of the law. 39 CRIM. LAW BULLETIN at 68-69.

The CJP's findings provide a window into a process designed with as much care as this politically sensitive issue permits, but which in practice is grossly arbitrary, unfocused, and very often influenced by racial factors. The CJP underscores what seems obvious – this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether a defendant should be put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed..

The Supreme Court's decisions in various death penalty cases are based on assumptions shown by the CJP's research to be unfounded. As such, the FDPA is unconstitutional as applied For example, in *Boyde v. California*, 494 U.S. 370 (1990), the Court rejected an Eighth Amendment challenge to a California jury instruction based on the incorrect assumption that jurors were not likely to understand the instruction as not allowing for consideration of mitigating evidence. Likewise, the Court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994), relied on the misimpression that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." *Id.* at 976. Conventional as the instructions may be, the CJP research demonstrates that they are not understandable to jurors.

In *Tuilaepa*, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* at 975. Perhaps the most important lesson from the CJP is that criminal juries are incapable of understanding

58

and applying the trial court's instructions. By the reasoning of *Tuilaepa*, the instructions, and the process and overarching scheme which has produced them, is unconstitutional. The Supreme Court's decisions upholding the death penalty are based on assumptions belied by the most reliable empirical evidence available. Rory Little, an Associate Deputy Attorney General from 1996-1997 who served on the capital case review committee, wrote an article about this process. In it, he explains: considering the "generality of these statutory aggravating factors and their commonality in many murders are considered together with the added authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." 26 FORD. URB. L.J.at 402.

This Court should declare the FDPA unconstitutional and permit this case to proceed as a non-death penalty case. In the alternative, Mr. Smith requests that an evidentiary hearing be scheduled to permit the presentation of expert testimony and empirical evidence to support the argument that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence.

CONCLUSION

The motions should be granted with any such other relief as the court deems just and proper. Should the Government dispute the cited facts, an evidentiary hearing is requested.

59

DATED this 1st day of March 2019.

/s/Suzanne Lee Elliott
Law Office of Suzanne Lee Elliott
1300 Hoge Building
705 Second Avenue
Seattle, Washington 98104
Phone (206) 623-0291
Fax (206) 623-2186
Email: Suzanne-elliott@msn.com

/s/StevenWells
Steven M. Wells P.C.
431 West 7th Ave. Suite 107
Anchorage AK 99501

/s/ Mark Larranaga
Walsh & Larranaga
705 Second Ave. Suite 501
Seattle WA 98104

## CERTIFICATE OF SERVICE

I, SUZANNE LEE ELLIOTT, certify that on November filed foregoing document with the United States District Court's Electronic Case Filing (CM/ECF) system, which will serve one copy by email on Assistant United States Attorneys FRANK V. RUSSO, WILLIAM A. TAYLOR, JAMES NELSON AND KAREN VANDERGAW.

/s/ Suzanne Lee Elliott
Law Office of Suzanne Lee Elliott
1300 Hoge Building

705 Second Avenue
Seattle, Washington 98104
Phone: (206) 623-0291
Fax: (206) 623-2186
Email: suzanne-elliott@msn.com