E-FILED
Friday, 24 August, 2018  06:17:07 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | <u>Hearing Requested</u> |

**<u>MOTION TO DECLARE THE FEDERAL DEATH PENALY ACT
UNCONSTITUTIONAL AS APPLIED ON THE GROUND THAT
THE FACTS OF THIS CASE, COUPLED WITH THE SOVEREIGN
DECISION OF THE STATE OF ILLINOIS TO ABOLISH CAPITAL
PUNISHMENT, DEMONSTRATE THAT ITS APPLICATION HERE
VIOLATES THE TENTH AMENDMENT AND PRINCIPLES OF
FEDERALISM OF THE CONSTITUTION OF THE UNITED STATES</u>**

## I.    INTRODUCTION

After some twenty years of public discussion and input from all segments of

Illinois society, on January 7, 2011, the House of Representatives of Illinois passed a bill

abolishing capital punishment. The Senate followed four days later. Approximately two

months later Governor Pat Quinn signed the legislation. *See Illinois Governor Signs*

*Capital Punishment Ban, N.Y. Times, Mar. 10, 2011, at A 18*. From that date forward,

neither its citizens, nor others, would be subject to the death penalty in this State. And,

no longer would its citizens be required to engage in the painful duty of determining

whether another human being lives or dies.

The measured reflection of the Illinois polity which ultimately led to abolition

did not focus on the morality of capital punishment *per se*. Rather, it was the discovery

of alarming and discomfiting problems in the reliability of convictions, along with evidence of racial, gender and geographic bias in the administration of capital punishment, that ultimately led its elected representatives to conclude that capital punishment should no longer be imposed in Illinois.

Here, the federal government has given notice pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 *et. seq.*, that it intends to ignore the carefully-considered judgment of the citizens of Illinois and ask twelve of them to impose the penalty of death on Brendt Christensen, a citizen of Illinois,[1] for crimes wholly committed within the state of Illinois and for crimes, kidnapping and murder, that violate its laws and traditionally fall squarely within the police power of the State. *See* Dkt. 26 (Superseding Indictment); Dkt. 54 (Notice of Intent to Seek a Sentence of Death).[2] This attempt to override the judgment of the citizens of Illinois, as expressed through their Legislature and Executive, cannot withstand analysis under the Tenth Amendment of the Constitution of the United States. This is so for two reasons.

First, the federal government's efforts to seek the death penalty in this case violate the Tenth Amendment because, in pursuing this goal, the national government is commandeering state resources to enforce a federal regulatory scheme that directly conflicts with the law of the State of Illinois. From the use of the State's law enforcement

---

[1] Mr. Christensen was born in Wisconsin and moved to Champaign, Il. in August of 2013, to attend the University of Illinois. He has resided in Illinois since that time. Section 1 of the Fourteenth Amendment to the U.S. Constitution provides that persons born in the United States are citizens of the State in which they reside.

[2] As in all states, these offenses are proscribed and seriously punished by the State of Illinois. *See* n. 27 *infra*.

and other state agencies to investigate and present this case to its directives to County and City Clerks and the State Board of Elections concerning selection of a jury, the fiscal and financial resources of this State are requisitioned by the federal government to directly achieve a goal rejected by the State's citizens. *See* IV-B, *infra.* In addition, the Federal Death Penalty Act (FDPA) unconstitutionally requisitions the resources of *other* States' resources when it provides that federal death sentences handed down in non-death penalty state will be implemented using the resources of another State. *See* IV-C, *infra.*

Second, in light of the State's primary responsibility for enforcement of the criminal law, especially that related to violent crime, the Tenth Amendment, reflecting accepted principles of federalism, prohibits the federal government from usurping the judgment of the citizens of the State on a matter of intense public interest and concern absent overriding concerns of the national government. Here, the State of Illinois' interests in protecting lives of all its citizens; protecting public confidence in the judicial system; protecting vulnerable groups; protecting the psychological welfare of its citizens who will be asked to serve as jurors; ensuring all its citizens have equal opportunity to serve as jurors and are not excluded either for views consonant with the political judgments of its elected officials or because of their religious beliefs; general interest in its resources not being used in a manner that is hostile to the State's policy; and its interest as a respected and equal sovereign in our constitutional framework far outweigh the federal government's interest in canceling out the State's political judgment in a case that does not involve uniquely federal interests; which requires a

sweeping interpretation of Commerce Clause jurisdiction, untethered to constitutional moorings and long-established federal jurisdiction in kidnapping cases, *see Motion to Dismiss Count One*, at 5-32 (filed 8-24-18); and where the penalty of life without parole is available under both federal and state law, thereby substantially impairing the federal government's interest in the death penalty. *See* V, *infra*. When all these factors are taken into account, the FDPA, *as applied here*, violates the Tenth Amendment.[3]

Before proceeding further, Mr. Christensen underscores what he is *not* arguing. Mr. Christensen does not suggest that the Constitution categorically prohibits the Federal government from seeking the death penalty in any state that has jettisoned capital punishment. Mr. Christensen concedes that the federal government may proceed in the face of the State's discordant political judgment, where paramount interests uniquely assigned to and enforceable by the national government are involved, *see* V, *infra, and* where the federal government has not unconstitutionally commandeered the State's resources to accomplish federal goals that are incompatible

---

[3] A litigant bringing a facial challenge to a statute must establish that it is unconstitutional in every case, while an "as applied" challenge is based on the statute's application to the facts of the particular case. *See Lawrence v. Texas,* 539 U.S. 558, 592 (2003) (Texas sodomy statute prohibiting certain forms of "deviant sexual intercourse" between individuals of the same sex, held unconstitutional as applied to consenting adults); *see generally Citizens United v. Federal Election Com'n,* 558 U.S. 310, 398-404 (Roberts, C.J., concurring) (distinguishing between facial and "as applied" challenges and noting the former are "disfavored." *Id.* at 398). Here, Mr. Christensen brings "as applied" challenges to the FDPA, limited to this case, where the resources of an abolition State are commandeered and where, as here, the interests at stake for the abolition State far outweigh those of the federal government. Thus, Mr. Christensen's claim is different from cases such as *United States v. Tuck,* 123 F. Supp. 2d 563 (D. Hawaii 1999), and *United States v. O'Reilly,* 2007 2421379 (E. D. Mich. 2007), where the defendants made facial attacks in asserting that the Tenth Amendment categorically bars the federal death penalty in all abolitionist States, or *United States v. Jacques,* 2011 WL 3881033 (D. Vermont 2011), and *United States v. Johnson,* 900 F. Supp. 2d 949 (N.D. Iowa 2012), where the defendants presented their claims under the Eighth Amendment.

with those of the State. *See* Part IV, *Infra*. But, neither condition is satisfied where, as here, the federal government asserts only a strained, overly-relaxed jurisdictional interpretation of the Commerce Clause in an attempted override of the State's decision to abolish capital punishment, *see Motion to Dismiss for Lack of Jurisdiction* (filed August 24, 2018), and then, adding insult to injury, uses State resources to achieve its goal. The dual sovereignty system of our federal compact, as articulated in the Tenth Amendment, prevents this attempt to hijack the considered judgment of the political departments of Illinois.

To contextualize why the federal government's effort to seek the death penalty in this case unconstitutionally entrenches upon the sovereignty of the State of Illinois, it is instructive to review in some detail the prolonged and "earnest and profound debate," *Washington v. Glucksberg* 521 U.S. 702, 751 (1997) (describing process by which the State of Washington decided to ban assisted suicide), in which officials of all three branches of the Illinois government, joined by the Fourth Estate, various advocacy groups, and the citizenry-at-large engaged in prior to abolishing the death penalty.

## II.  THE EVENTS LEADING THE POLITICAL BRANCHES OF THE STATE OF ILLINOIS TO ABOLISH CAPITAL PUNISHMENT

In the 1948 film, "Call Northside 777," Jimmy Stewart plays a Chicago reporter, James McNeal, whose editor assigns him to investigate the case of Frank Wiecek, convicted twelve years previously for the murder of a police officer and sentenced to life imprisonment. Although initially skeptical of Wiecek's claim of innocence, McNeal's investigation exposes police misconduct in interrogating Wiecek, suppression

of exculpatory evidence by the police and prosecution and demonstrable perjury by the key eyewitness. McNeal's dogged investigation eventually reveals Wiecek's innocence.

Beginning in the late 1980s, the advent of DNA testing, accompanied by exhaustive re-investigations, revealed that movies such as Call Northside 777 were not the mere imaginative creations of Hollywood writers. From 1987 through 2009, at least 20 inmates who had been sentenced to death in Illinois were exonerated and released. Many had resided on death row for several years, living under the cloud of their approaching execution. With the new DNA technology, it became apparent that several prisoners had been sentenced to die for crimes they had not committed. Renewed investigations, spurred by newly-discovered exonerating evidence, revealed unfounded convictions grounded in perjured testimony by jailhouse informants or accomplices, forcibly-extracted confessions, mistaken eyewitness testimony and for crimes committed by others, whose subsequent confessions were corroborated. In some of these exonerations, prosecutors had failed to disclose favorable evidence. In others, pseudo-scientific evidence had been used. One defendant had even been sent to death row by a corrupt judge. As a result of these shocking miscarriages of justice, a public discussion ensued over the ensuing 20 years, involving all segments of Illinois' society.[4]

The series of exonerations began in 1987 when evidence revealed that Perry Cobb and Darby Tillis had been falsely convicted on the basis of the perjured testimony of a woman who had testified that she overheard Cobb and Tillis talking about the robbery

---

[4] For a detailed history of the abolition of the death penalty in Illinois, *see* Warden, *How and Why Illinois Abolished the Death Penalty*, 30 Law and Ineq. (Minnesota Journal of Law and Inequality) 245 (2012) (hereinafter, Warden).

and murder of two hot dog vendors although she knew that her boyfriend had planned the murder and had later told her that he killed the two men after "something went wrong." The miscarriage came to light only after an Assistant State's Attorney read about the case several years after the conviction and recalled that the same woman, when they had been co-workers in a factory, had once told him about the boyfriend's commission of a murder during a robbery of a hot dog stand. *See* Linnett Myers, *2 Acquitted of Murder After 9 Years in Prison*, CHI. TRIB., January 21, 1987.

In 1994, Joe Burrows' conviction and death sentence for the murder of an 88 year-old was vacated as a result of investigative reporting by a real-life, James McNeal. Peter Rooney was a reporter for the Champaign News-Gazette, when he received information that Burrows had been convicted on the basis of perjured testimony of Gayle Potter, a cocaine addict, who had actually committed the murder and that of Ralph Frye, an individual with an IQ of 75, who had received leniency after being coerced into falsely implicating himself and Burrows. Confronted with Rooney's discovery of a letter from Potter asking a friend to testify falsely to corroborate her contrived implication of Burrows, Potter confessed to Rooney that she falsely accused Burrows because she had committed the murder to obtain drug money. Both Potter and Frye, who also recanted, were subsequently convicted of perjury and sentenced to prison terms. *See Perjured Testimony by the Actual Killer Put Joseph Burrows on Death Row*, Center on Wrongful Convictions: Bluhm Legal Clinic, Northwestern School of Law, http://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/il/joseph-burrows.html (visited 8-1-18); Peter Rooney, A True Story of Murder, Betrayal

and Miscarried Justice (Amazon Press) (2011).

In 1995, Rolando Cruz and Alejandro Hernandez were exonerated in a notorious case involving the murder and rape of a ten year-old girl in 1983. Eventually, Brian Dugan confessed that he had actually committed the crime and DNA testing excluded Hernandez and Cruz. A renewed investigation revealed that the detectives had lied at trial. Dugan later pleaded guilty and was sentenced to death. *See* Warden, *supra*, at 249; National Registry of Exonerations,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3292

(visited 8-1-18); *see also* Rick Pearson, *Ryan 'Sorry' for Nicarico Mistakes*, CHI. TRIB., Nov. 13, 2009.

In 1996, DNA evidence, and a reexamination of a case by students from the Northwestern School of Journalism, led to a corroborated confession from the real killer and freed Dennis Williams and Verneal Jimerson from death row, where they had been sent for the 1978 abductions of a young man and woman from a gas station in suburban Chicago and their later murders. Both had spent 18 years in prison, mostly on death row. *See* Don Terry, *DNA Tests and a Confession Set Three on the Path to Freedom in 1978 Murders*, N.Y. Times, June 15, 1996, at A6.

Gary Gauger was convicted of the murder of his parents in 1993 and sentenced to death based in large part on the testimony of a jailhouse informant. Later, a member of the Outlaw motorcycle gang informed ATF agents that the murders were actually committed by fellow gang members in a botched attempt to rob Gauger's parents at their farmhouse. Gauger's conviction was reversed in 1996. After the cooperating gang

member secretly tape-recorded a gang member's description of the murder, two

members of the motorcycle gang were later convicted. *See* Warden, *supra*, at 250-251;

Dave Dailey, *Biker Discusses Killings on Tape Played in Court*, CHI. TRIB. Apr. 25, 2000

(Metro, at 2).

In 1996, Carl Lawson was acquitted at a retrial after having been sentenced to

death for the murder of an 8 year old found in an abandoned church in East St. Louis.

Despite the fact that the key piece of evidence against him was a bloody shoe print, the

trial court had denied Lawson's *pro se* motion for independent testing and analysis of

the shoe print, causing reversal of his conviction. *People v. Lawson*, 644 N.E.2d 1172

(Ill.1994). The shoe print evidence was later discredited and Lawson was acquitted at a

retrial. Other evidence suggested that the crime had been committed by a drug addict,

who had been a suspect initially, but had been ruled out because of the erroneous

interpretation of the shoe print evidence. *See* Warden at 251-52; National Registry of

Exonerations, Carl Lawson,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3375

(visited 8-1-18).

Although each of these incidents received extensive publicity, the public

discussion was amped up when the Chicago Tribune[5] published a five-part series in

January 1999, addressing the issue of wrongful convictions and their relationship to

---

[5] As of January 2017, the Chicago Tribune had the largest circulation in the state and sixth largest in the country. *See* America's 100 Largest Newspapers, https://247wallst.com/media/2017/01/24/americas-100-largest-newspapers/ (visited 8-1-18).

prosecutorial misconduct. Ken Armstrong & Maurice Possley, *Trial & Error: How*

*Prosecutors Sacrifice Justice to Win* (pts. 1-5), CHI. TRIB., *The Verdict: Dishonor*, Jan. 10,

1999,[6] *The Flip Side of a Fair Trial*, Jan. 11, 1999;[7] *Prosecution on Trial in DuPage*, Jan 12,

1999;[8] *Reversal of Fortune*, Jan 13, 1999;[9] *Break Rules, Be Promoted*, Jan. 14, 1999.[10]

    Within a year of the Tribune's series, another exoneration was highly publicized.

Anthony Porter, with an IQ of 51, was scheduled to die on September 24, 1998, for the

murder of a young man and woman in a park on the south side of Chicago in 1982,

when only 48 hours before his scheduled execution his attorney obtained a stay to

determine whether he was capable of understanding why he was being executed.[11] As it

---

[6] After reciting analysis of the data which showed that at least 381 homicide convictions had been "thrown out because prosecutors concealed evidence suggesting the defendant's innocence or presented evidence they knew to be false," 67 of which were cases where the defendant had been sentenced to death, the article warned that such misconduct "fosters a corrosive distrust" of the criminal justice system. The article also noted that 46 of the 381 reversals involved trials in Illinois, an astonishing 12% of those nationwide.

[7] Describing history of prosecutorial misconduct in Cook County resulting in reversals for using false evidence, suppressing evidence and overreaching in arguments. In an effort to win at all costs "no case was too serious and no case was too small."

[8] Recounting the upcoming trial in DuPage County of three former prosecutors and four current sheriff's deputies accused of framing Rolando Cruz for the murder of a ten year-old girl by concocting incriminating evidence and suppressing exculpatory evidence.

[9] Recounting the evidence in the "Ford Heights 4 case," where "four innocent men were convicted and two of them condemned to die." *See* Dennis Williams and Verneal Jimerson, *supra*. Article details history of misconduct and abuse by the lead prosecutor and notes that in Cook County State Attorney's office: "Winning is rewarded. Cheating goes unpunished," and that even after reversals for such misbehavior, "attorneys [are] promoted rather than reprimanded."

[10] Continuing the theme of the prior article: After beginning with a recital of a case where three prosecutors "drew scathing rebukes" by an appellate court for their misconduct and reprimands from the state's disciplinary agency but nonetheless were later elected judges, article notes that "[A]nalysis of appellate rulings spanning the past two decades turned up 39 other Cook County prosecutors who also became judges after cases they prosecuted were reversed because of misconduct."

[11] The 8th Amendment prohibits the execution of an insane person who is unable to understand "the reasons for the penalty or its implications." *Ford v. Wainwright*, 477 U.S. 417 (1986).

turned out there was another more fundamental reason why Porter might not understand why he was being executed – for further inquiry into the underlying facts revealed that Porter was likely innocent. A subsequent investigation resulted in a recantation by the main eyewitness, who claimed he had been pressured by Chicago detectives, and a videotaped confession from the actual killer, corroborated by his estranged wife. Porter's ultimate release was widely reported under the eyes of television crews and news helicopters. *See* Warden at 256-57; Monica Davey, *Anthony Porter, The 4 Walls of His Life*, CHI. TRIB., July 18, 1999; The National Registry of Exonerations, A Project of the University of Michigan Law School, Anthony Porter, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3544 (visited 8-1-18).[12]

In light of the Porter embarrassment, calls increased for a moratorium on the death penalty in Illinois, echoing a similar resolution of the American Bar Association advocating a national moratorium on executions. *See* Warden at 257, n. 104; Resolution, American Bar Association, Section on Individual Rights and Responsibilities, Feb. 3, 1997 (http://www.deathpenaltyinfo.org/american-bar-association-resolution (visited 8-1-18). Shortly thereafter, with the moratorium issue still under consideration, the Illinois Supreme Court reversed the conviction of Steven Smith, who had been convicted and sentenced to death on the testimony of a sole eyewitness, who admitted

---

[12] Alstory Simon, whose confession to the murders freed Porter, plead guilty and received a sentence of 37 years. After Simon had served 15 years, the State's Attorney agreed to his release, citing evidence suggesting that *he* had been coerced, and adding that she "can't definitely tell you if it was Porter or Simon . . ." *See* Registry of Exoneration, *supra*; Steve Mills, Steve Schmadeke and Dan Hinked, *Prosecutors Free Inmate in Pivotal Illinois Death Penalty Case*, CHI/ TRIB. Oct. 30, 2014

she was using crack at the time of the incident. Her purported identification of Mr.

Smith as the killer, while standing across the street at night, sharply contrasted with the

inability of two individuals to make an identification when standing nearby the victim

at the time of the murder. Re-investigation of the case uncovered evidence that the

police initially suspected the boyfriend of the eyewitness' sister, thus providing the

motive for her to fabricate the identification. In August 2002, Smith was pardoned on

ground of actual innocence. *See Governor Pardons 2 Death Row Inmates*, CHI. TRIB., Aug.

2, 2002; Dubious Testimony by a Purported Eyewitness Landed Steven Smith on Death

Row,

http://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/il/

steven-smith.html (visited 8-1-18).

In May 1999, yet another death row inmate was cleared. Ronald Jones had been

convicted and sentenced to die for a 1985 rape and murder in Cook County. The main

evidence against Jones was a confession, which he maintained had been given as a

result of an 18-hour interrogation in which he had been beaten by Chicago police

officers, an allegation corroborated by photos of his injuries. DNA testimony later

eliminated Jones as the source of semen in the victim's vagina and he was released after

14 years in custody. *See* Dirk Johnson, *12th Death Row Inmate in Illinois Is Cleared,* N.Y.

Times,May 19, 1999; Ronald Jones, The National Registry of Exonerations, A Project of

the University of Michigan Law School,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3340

(Visited 8-1-18).

In response to these growing concerns both the legislative and judicial branches attempted fixes. The General Assembly passed the Capital Crimes Litigation Act in 1999, which provided additional funding for the defense of capital cases. In 2001, the Illinois Supreme Court enacted rules establishing minimum standards and training for judges in capital cases, standards of experience for defense counsel and specific ethical rules for prosecutors. Ill. SUP. Ct. R. 3.8(a), 43 (effective Mar. 1, 2001); *see also* R. 714 (effective Jan. 1, 2005).

In November 1999, a series of articles in the Chicago Tribune once again focused the public's attention on the administration of criminal justice in Illinois. This time the series zeroed in on flaws in the state's capital punishment procedures, citing poor representation by attorneys who had been or were later disbarred or suspended from the practice of law, unreliable testimony from jailhouse snitches, coerced confessions and the use of bogus scientific evidence. *See* Ken Armstrong & Steve Mills, *The Failure of the Death Penalty Illinois* (pts. 1-5), CHI. TRIB., *Death Row Justice Derailed*, Nov. 14, 1999;[13]

---

[13] Recounting a capital punishment regime in Illinois "riddled with faulty evidence, unscrupulous trial tactics and legal incompetence." Among the recitals are that on at least 33 occasions "a defendant sentenced to die was represented at trial by an attorney who has been disbarred or suspended," 35 trials where a black defendant was sent to Death Row by an all-white jury, and 14 men put on death row by coerced confessions obtained by the Burge crew. *See infra*.

*Inept Defenses Cloud Verdict*, Nov. 15, 1999;[14] *The Jailhouse Informant*, Nov.16, 1999;[15] *A Tortured Path to Death Row*, Nov 17, 1999;[16] *Convicted by a Hair*, Nov.18, 1999.[17]

In January 2000, Cook County prosecutors dropped charges against Steve Manning whose conviction for murder of a businessman and resulting death sentence had been reversed in 1998. The key evidence against Manning had been the testimony of a jailhouse informant "with [such] a long history of telling lies," that a federal prosecutor had once described him as a "pathological liar." *See* Armstrong and Mills, *Another Death Row Inmate Cleared*, CHI. TRIB., Jan 19, 2000, at 1,; Warden, *supra,* at 262-263.

Less than a month later, with matters at a tipping point and polls reflecting public disquiet with the problems that had surfaced in the state's criminal justice system, Governor Ryan declared a moratorium on executions in Illinois. *Id*, at 263-264

---

[14] Continuing the theme of the often incompetent representation by attorneys in capital cases with "meager qualifications" and "little experience:" Four of the 12 defendants who had been exonerated at that time had been represented at trial by attorneys who were later disbarred or suspended. Also, reciting cases where attorneys showed up late for hearings, failed to develop and present available mitigating evidence and, remarkably, one case where an attorney waived a jury trial to save time and expense.

[15] After recounting the abuse in the use and lack of credibility of many jailhouse informants, article notes that "in Illinois at least 46 inmates have been sent to death row in cases where prosecutors used a jailhouse informant" and such testimony "helped convict or condemn 4 of the 12 Illinois Death Row inmates who were later exonerated [as of the time of the article]."

[16] Recounting the activities of the Burge group, *infra*, and circumstances leading to death sentences for "10 Death Row inmates put there through the work of one of the state's most discredited group of police officers." Reviews of the cases of Ronald Jones, Gary Gauger, Stanley Howard, Madison Hobley, Aaron Patterson, Ronald Kitchen, Leroy Orange, and Andrew Wilson, each of whom was sent to Death Row on the basis of alleged confessions elicited by the Burge group and later exonerated.

[17] Discussing cases where later discredited hair analysis testimony, in some cases, confidently, albeit falsely, portrayed as "fact and certainty," played a significant role in conviction of later exonerated death row inmates, including the cases of Dennis Williams and Verneal Jimerson, *supra*.

(citing poll finding that 70% of Illinoisans agreed with the moratorium).

On May 4, 2000, Governor Ryan appointed a 14-member Commission on Capital Punishment, to review the administration of capital punishment in Illinois. Ill. Exec. Order No. 4 (May 4, 2000). The Commission was charged, *inter alia*, "[T]o study and review the administration of the capital punishment process in Illinois to determine why that process has failed in the past, resulting in the imposition of death sentences upon innocent people."

https://www2.illinois.gov/Documents/ExecOrders/2000/execorder2000-04.pdf#search=execorder2000%2D04 (visited 8-1-18). The Commission was chaired by Frank J. McGarr, former Chief Judge of the U.S. District Court for the Northern District of Illinois, co-chaired by former U.S. Senator Paul Simon and former U.S. Attorney, Thomas P. Sullivan, and included the Deputy Governor, representatives from the prosecution, defense, police, bar and business community. *See* Report, *infra*, at v-vii.

In April 2002, the Commission issued a 208 page report recommending extensive reforms in the state's criminal justice system. In order to determine "whether, and to what degree, extra-legal factors play[ed] a role in the death sentencing process" in Illinois, the Commission enlisted experts from Northeastern University in Boston and the University of Colorado to conduct an appropriate study. Their final report found that "the race of the victim influences who is sentenced to death . . . [and] . . . a sharp difference in the rate at which defendants were sentenced to death in different regions of the state," suggesting a "wide divergence in the way that prosecutors are exercising

their discretion about whether to seek the death penalty, resulting in little uniform application of this most severe penalty." Report of the Governor's Comm. On Capital Punishment, April 15, 2002 at 196-197, *available at*

[http://illinoismurderindictments.law.northwestern.edu/docs/Illinois_Moratorium_Commission_complete-report.pdf](http://illinoismurderindictments.law.northwestern.edu/docs/Illinois_Moratorium_Commission_complete-report.pdf) (visited 8-1-18). Pursuant to the Committee's suggestion, the Illinois General Assembly created a Capital Punishment Reform Study Committee, charged with the duty of annually reporting to the legislature concerning the progress of various reforms. *See* 20 ILL. COMP. STAT. ANN. 3929/2.

On January 11, 2003, Governor Ryan granted pardons based on innocence to four death row inmates who had been tortured by Chicago police officers. *See* Warden, *supra*, at 269. Aaron Patteson, Leroy Orange, Stanley Howard and Madison Hobley had all been convicted largely on the basis of confessions that had been elicited through beatings, staged suffocations, use of electroshock by cattle prods and adapted hair dryers and other forms of physical and psychological torture, all inflicted by a notorious unit of the Chicago Police Department, headed by one Jon Burge. The activities of the Burge group had been the subject of several well-publicized investigations long before Governor Ryan's pardon of the four death row inmates. In 1990, the Chicago Police Department's Office of Professional Standards had concluded that Burge and the officers in his unit had engaged in the "systematic" and "methodical" physical and psychological abuse of suspects in their custody. Chicago Police Department, Office of Professional Standards, Special Project Conclusion Report, 28 September 1990, at 3,

[http://peopleslawoffice.com/wp-content/uploads/2012/02/Goldston-Report-with-](http://peopleslawoffice.com/wp-content/uploads/2012/02/Goldston-Report-with-)

11.2.90-Coversheet.pdf (visited 8-1-18**)** (Of the 50 alleged victims, the investigations

showed Burge himself was involved in 51% of the cases where the abuser could be

identified. Appendix F at page 1). Like the exonerations, these revelations were the

subject of widespread media coverage. Amnesty International (AI) called for an

independent inquiry and various citizens' organizations and politicians pressed for

further investigations. *See* Amendment to House Bill 765 (Illinois Innocence Inquiry

Commission Act), Illinois General Assembly, 2007-03-27 (referencing Burge group

activities and calls for investigations by AI and United Nations Committee Against

Torture).

The Chicago Police Board had fired Burge in February 1993, after finding he had

been guilty of "physically abusing" suspects, *see* Charles Nicodemus, *Burge Fired in*

*Torture Case – Guilty of Abusing '82 Murder Suspect*, CHI. TRIB. Feb. 11, 1993, but fallout

from the Burge group raised even more questions about the reliability of other death

sentences. In August 2000, the Illinois Supreme Court reversed or remanded two Burge-

related death row cases based on the torture allegations. *People v. Patterson*, 192 Ill. 2d

93, 123 (2000) (citing OPS report that physical and psychological abuse was "systemic

and methodical"); *People v. King*, 192 Ill. 2d 189 (2000); *see also* Ken Armstrong and Steve

Mills, *Justices Reject 6 Death Sentences - - 2 Inmates Get New Hearings on Police Brutality*

*Charges*, Aug. 8, 2011.**[18]**

---

[18] The Burge saga continued long after Governor Ryan's pardon of the four men, each of whom eventually filed civil rights suits against the City of Chicago and various officers and officials. In 2008, the City of Chicago paid close to 20 million dollars to settle the claims. Although statute of limitations prevented filing criminal charges related to the torture, Burge was eventually tried and convicted in the federal court in the Northern District of Illinois for perjury and obstruction of justice for false testimony he gave in related civil depositions and sentenced to 4 and ½ years in prison. For an exhaustive list of

The following day, after noting that the administration of capital punishment in Illinois is "haunted by the demon of error," both in the determination of guilt and the selection of "who among the guilty deserves to die," Governor Ryan commuted the death sentences of all 167 inmates on death row.

http://www.pewforum.org/2002/06/03/governor-george-ryan-an-address-on-the-death-penalty/ (visited 8-1-18)(Governor Ryan's commutation speech at Northwestern School of Law).

 The commutations did not, however, stanch the exonerations. On May 29, 2004, Gordon Steidel, who had been incarcerated for 17 years, 12 on death row, was exonerated after an Illinois State Police investigation concluded he was innocent. The main witness against him recanted and no physical evidence had linked Steidel to the murders for which he had been convicted. *See* Hal Dardick, *Inmates Free After 17 Years*, CHI. TRIB., May 29, 2004 (Metro), at 16.

Emphasizing the arbitrariness and lack of reliability in the administration of capital punishment in Illinois, on March 2007, the *Chicago Tribune* reversed an editorial position it had maintained for 138 years and called for "an end to capital punishment. It is time to stop killing in the people's name." Editorial, *Abolish the Death Penalty*, CHI. TRIB., Mar. 25, 2007, at 6. Three weeks later the *Tribune* noted that, contrary to expectations, "there [had been] barely a ripple" in opposition to its call for abolition. Timothy J. McNulty, *Opinion Shift Passes Quietly*, CHI. TRIB., Apr. 10, 2007, at 13.

---

articles and sources concerning the Jon Burge saga, see Jon Burge, Wikipedia, Notes, https://en.wikipedia.org/wiki/Jon_Burge, (visited 8-1-18).

In June 2008, the governing body of the Illinois State Bar Association joined the chorus of cries to do away with the state's capital punishment apparatus. Minutes of the Assemb. of the Ill. State Bar Ass'n (June 28, 2008), *cited at* Warden, p. 274, n. 247.

On April 9, 2009, a 19th exoneration occurred when Nathson Fields was freed after evidence developed that he had been sentenced to death by a corrupt judge, who had originally accepted a $10,000 bribe in connection with the case. Sensing that law enforcement officers were on to him, the judge returned the bribe and turned around and sentenced Fields and his co-defendant to death. Fields was acquitted after spending 17 years behind bars, 11 on death row. He was acquitted in a new trial after two of the key witnesses recanted and revealed that police and prosecutors had coerced them to testify falsely at the first trial. *See* Matthew Walberg, *Judge's Injustice is Righted---23 Years Later,* CHI. TRIB., Apr. 9, 2009, at 1; Nathson Edgar Fields, National Registry of Exonerations,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3215

(visited 8-1-18).[19]

Next came Ronald Kitchen, who had falsely confessed to quintuple murders after being tortured by the Burge gang at the Chicago Police Department. Other than the coerced confession, which had been elicited after 16 hours of physical coercion, the key

---

[19] Fields later brought a civil rights complaint under 42 U.S.C. § 1983, against prosecutors who had induced his wrongful conviction and resulting 17 years of incarceration by coercing witnesses to falsely testify against him. Referring to the "breathtaking injustice," the 7th Circuit rejected the prosecutors' claim of absolute immunity, holding that they were not entitled to such immunity because they were acting as investigators rather than prosecutors at the time. *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014).

evidence against Kitchen was the testimony of a jailhouse informant whose credibility was undermined. Despite evidence corroborating the serious physical abuse inflicted upon Kitchen by Chicago detectives, he was convicted and sent to death row. Over the ensuing years, as the evidence continued to mount against the Burge crew, the Illinois Attorney General reinvestigated the Kitchen case and agreed to vacation of his conviction on July 9, 2009. Ronald Kitchen, National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3355 (visited 8-1-18); *see also* Hal Dardick, 12.3M for Two Alleged Burge Victims: City's Tab in Cases Linked to Former Police Commander Hits 85M, CHI. TRIB. Sept. 5, 2013.

   As the number of miscarriages in capital cases mounted, support for the death penalty in Illinois began to wane and editorials in other papers around the state joined the Chicago Tribune's earlier call for abolition. *See* Editorial, *Our Opinion: It's Time for State to Abolish Death Penalty in Illinois*, ROCKFORD REG.-STAR, Nov. 9, 2010, at 9A ("[W]e must abolish capital punishment in our state, now and forever."); Editorial, *Our Opinion: It's Time for State to Abolish Death Penalty*, St. J.-REG. (Springfield), Nov. 14, 2010, at 14 ("[A] state with a record like that [of Illinois] has no business, ever, of resuming capital punishment.").

   On October 28, 2010, the Capital Punishment Reform Study Committee, *supra*, issued its Sixth and Final Report, recommending a host of changes to the administration of capital punishment in Illinois.[20] *See*

---

[20] As to disparity, the Committee found that "a defendant indicted on a capital-eligible first degree murder was three times more likely to receive a death sentence if he was indicted and convicted in a county outside Cook County." *Id*. at 133-34. As to racial disparity, in contrast to the Governor's Committee, *id*.

http://illinoismurderindictments.law.northwestern.edu/docs/CPRSC-Sixth-and-Final-Report.pdf (visited 8-1-18).

In its aftermath, a bill was introduced and then passed in the Illinois General Assembly, putting an end to capital punishment in the State.[21] After almost two decades of frustrating experience with capital punishment and input from and consideration by all segments of Illinois society, Governor Pat Quinn signed the abolition legislation on March 9, 2011, thereby consigning capital punishment in this state "to the rubbish heap of history." Warden, *supra,* at 284.

The issue presented by this motion is whether the Constitution permits the United States to disregard this disturbing history and the solemn and considered judgment of the people of Illinois concerning the imposition of capital punishment for this crime – one committed entirely within the State of Illinois, severely punished by the State, long considered as uniquely assigned to the police power reserved to the States and one not implicating either foreign policy or other unique national interests of the federal government. Mr. Christensen submits that it does not.

III.     FEDERALISM AND THE DUAL SOVEREIGNTY STRUCTURE OF THE CONSTITUTION ASSIGNS THE STATES THE PARAMOUNT INTEREST IN THE SUPPRESSION AND PUNISHMENT OF VIOLENT CRIME.

The concept of federalism and its recognition of the respective division of

---

at 132, the Committee concluded that there was insufficient evidence as to "whether there still exists in Illinois a significant racial disparity in capital sentences, that is, whether it is more likely that a murder of a white person will result in a death sentence than a murder of a non-white person." *Id.* at 134.

[21]The bill presented to the governor read: " . . . notwithstanding any other law to the contrary, the death penalty is abolished and a sentence of death may not be imposed." 725 Ill. COMP. STAT. ANN. 5/119-1 (West 2008 & Supp. 2011).

sovereign authority between the federal and state governments is a fundamental tenet of our constitutional form of government. *See* Friendly, Federalism: A Forward, 86 Yale L.J. 1019 (1977); *Alden v. Maine*, 527 U.S. 706, 750 (1999) (noting that the Constitution recognizes "the essential sovereignty of the States"). "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States,* 567 U.S. 387, 398 (2012).

This dual constitutional framework has two broad philosophical underpinnings. First, the "essential attribute of the States' sovereignty [is] that they remain independent and autonomous," *Printz v. United States*, 521 U.S. 898, 928 (1997), "accord[ing] States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Second, the Founding Fathers framed this division of power between separate sovereigns as a means to ensure the protection of individual liberty threatened by the concentration of power in one body. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.").

> "The document [Constitution] sets forth, and rests upon, innovative principles original to the American experience, such as federalism; a proven balance in political mechanisms though separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and preserve human dignity. These doctrines and guarantees are central to the American experience and remain essential to our present-day self-definition and national identity."

*Roper v. Simmons*, 543 U.S. 551, 578 (2005); *see also Murphy v. National College Athletic Association*, 138 S.Ct. 1461, 1477 (2018).

A corollary of this second aspect of federalism is that its principles are enforceable by individuals. "The limitations that federalism entails are not . . . a matter of rights belonging only to the States." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). Because "federalism protects the liberty of the individual from arbitrary power . . . [and because . . . [a]n individual has a direct interest in objecting to laws that upset the constitutional balance between the National government and the State," *id.*, an aggrieved individual has standing to raise Tenth Amendment objections. "Fidelity to the principles of federalism is not for the States alone to vindicate." *Ibid*.

To accomplish these objectives, "[t]he Constitution [] creates a national government with defined and enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552 (1995). Thus, the national government's powers are not unlimited. "[R]ather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers." *National Federal of Independent Bunsiness v. Sebelius*, 132 S. Ct. 2566, 2577 (2012). "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293, *quoted in Lopez*, 514 U.S. at 552 (1995). The powers retained by the States represent their "residuary and inviolable sovereignty." *Id.*, No. 39, p. 245 (C. Rossiter ed. 1961), *quoted in Murphy v. National College Athletic Association*, 138 S.Ct. 1461,

1475 (2018).

This critical role of state sovereignty in our federal system is enshrined in the Tenth Amendment, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. "Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of the national power. The Amendment confirms the promise implicit in the original document." *Alden v. Maine*, 527 U.S. at 713-14. "The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Fry v. United States*, 421 U.S. 542, 558, n.7 (1975).

Among the enumerated powers not delegated to the federal government in Article One, Section 8 of the Constitution is the Police Power. From the earliest days of the republic, it was accepted that the Police Power was assigned to the states under the Tenth Amendment. *See Cohens v. Virginia*, 6 Wheat. 264, 426, 428 (1821)(Marshall, C.J.) (Congress has no power to punish murder within the States or felonies generally); *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014). That principle persists through modern constitutional interpretation. *United States v. Lopez*, 514 U.S. 549, 566 ("The Constitution withholds from Congress a plenary police power."). Accordingly, States have "primary authority for defining and enforcing criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (internal citation omitted). "The wisdom of assigning the States the "core

police power . . . includ[ing] authority to define criminal law and to protect the health, safety, and welfare of their citizens," *Gonzales v. Raich*, 545 U.S. 1, 42-43 (J. O'Connor, dissenting), is that it permits the States to "perform their role as laboratories for experimentation to devise various solutions" to difficult issues of policy regarding the punishment of crime. *United States v. Lopez*, 514 U.S. at 581-83 (J. Kennedy, concurring).

These principles apply with particular force to violent crimes. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). Thus, when Congress creates federal jurisdiction over criminal conduct historically within the Police Power of the States, it intrudes on the "sensitive balance" of power allocated between the two sovereign governments. *Lopez*, 514 U.S. at 561, n. 3 (1995).

## IV.  THE FEDERAL GOVERNMENT VIOLATES THE TENTH AMENDMENT WHERE, AS HERE, IT COMMANDEERS STATE RESOURCES TO ENFORCE A FEDERAL REGULATORY SCHEME THAT DIRECTLY CONFLICTS WITH THE LAW AND POLICIES OF THE STATE

### A.    The Anti-Commandeering Principle

Reflecting the concept of federal-state dual sovereignty, the Framers of the Constitution made a "fundamental structural decision . . . to withhold from Congress the power to issue orders directly to the States." *Murphy v. National College Athletic Association*, 138 S.Ct. 1461, 1475 (2018). Inherent in a State's sovereignty is a prohibition on the national government from requisitioning or "commandeering" a State's resources to implement the objectives of the national government. *See New York v.*

*United States*, 505 U.S. 144, 156-57 (1992) (freedom from federal commandeering is "an incident of state sovereignty").

Thus, the Constitution does not invest Congress with the power either "to impress the state executive into its service," *Printz,* 521 U.S. at 898 (holding provision of Brady Act requiring "state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme," *id.* at 904, violates the Tenth Amendment), or direct a state legislature to enact or refrain from acting legislation. *Murphy v. National College Athletic Association*, *supra* (Act requiring States to not authorize sports betting violates the Tenth Amendment). Nor can the federal government direct the State to enforce a federal regulatory program. *Murphy*, 138 S. Ct. at 1477; *New York, supra* (federal law requiring New York to either take title to radioactive waste or regulate in conformance with Congressional directive incompatible with the State's sovereignty accorded by the Tenth Amendment).

This anti-commandeering principle is illustrated by *Printz v. United States*, *supra*, which involved a provision of the Brady Handgun Violence Prevention Act requiring state officials to participate in the Act's enforcement by reviewing transfer forms sent them by firearms dealers to determine whether the proposed sales or transfers complied with the Act. *Id*. 904. Although the Act only required the state officials to participate for a limited time (until a national instant background-check system could be set up), the Court held that a federal statute that commandeered state resources to enforce a federal regulatory program was "fundamentally incompatible with our constitutional system of dual sovereignty," despite its temporary nature, and that the Tenth Amendment is

violated when Congress enacts provisions, which place the machinery of the State at the federal government's beck and call. *Ibid*. 908.

### B.     The Federal Government is Directly Commandeering the State of Illinois' Resources to Achieve a Goal Contrary to State Policy

The State of Illinois has an interest in its resources not being used in a manner incompatible with its goals. The federal government's pursuit of the death penalty in this case slights these interests in several ways. In attempting to override the judgment of the citizens of Illinois through its elected representatives, the federal government unconstitutionally taxes the State's resources with both its citizens as jurors, its law enforcement officers as investigators and possible witnesses and its state agencies commandeered to assist in this prosecution. This significantly impacts on state sovereignty. *See Printz*, 521 U.S. at 922 ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service – and at no cost to itself – the police officers of the 50 States."). Mr. Christensen does not contend that the use of state resources in a federal criminal trial necessarily constitutes a *per se* violation of the commandeering prohibition in all cases. But, where the use of such resources by the federal government to pursue a goal that is directly incompatible with fundamental interests of the State, *see* V, *infra*, the anti-commandeering principles of the Tenth Amendment are implicated.[22]

Further, the federal government's use of state agencies to select the jury pool

---

[22] Although not invariably required since a defendant can raise Tenth Amendment claims, *see Bond*, *supra*, cases such as *Printz*, *Murphy* and *New York* arose because the State specifically objected to the federal government's unconstitutional interference with State prerogatives.

which will be used to seek a death sentence squarely fits into *Printz* and directly illustrates prohibited commandeering of the State of Illinois' resources to enforce a federal regulatory scheme in the face of contrary state law and policy. 18 U.S.C. § 1863 (a) requires federal district courts to devise and put in place a written plan for random selection of grand and petit jurors. § 1863(b) authorizes such plans to use voter registration and other sources of names when necessary. In accordance with these provisions this Court created The Jury Selection Plan of the United States District Court For the Central District of Illinois For the Random Selection of Grand And Petit Jurors (Effective June 1, 2015), http://www.ilcd.uscourts.gov/sites/ilcd/files/general-ordes/Jury%20Selection%20Plan%202015.pdf (Plan), which provides that potential jurors will be selected "at random from the registered voter lists in each gubernatorial election." *See* Plan, at 4. The Plan provides that registered voters in each gubernatorial general election list are those maintained by the County Clerk in each county, the City Clerk (if separate city lists exist), or the office of the State Board of Elections for the State of Illinois within the Central District of Illinois. *Id*. at 5. The Plan requires that the "clerk issue written instructions *directing* the State Board of Elections to provide a list of all registered voters in the district in electronic format ('voter data files')" and that "[the clerk] shall also *require* the State Board of Elections to provide an affidavit stating that the voter data files contain a list of all registered voters in the district." *Id*. at 6. (Emphasis added).

The County Clerks, City Clerks and the State Board of Elections are all agencies of the State of Illinois or its political subdivisions. The District's Plan adopted pursuant

to The Jury Selection and Service Act of 1968, 18 U.S.C. § *et seq.* thus directs these state officials to use state resources to further a federal regulatory scheme (the Federal Death Penalty Act) that is directly contrary to the explicit policy judgment of the Illinois Legislature abolishing the death penalty in Illinois.[23]

Mr. Christensen recognizes that state voter lists are required to be maintained by federal law. *See* 52 U.S.C. § 20501 *et seq.* (National Voter Registration Act of 1993). Nonetheless, the Voter Registration Act "intrudes deeply into the operation of state government," *Acorn v. Edgar*, 56 F. 3d. 791, 792 (7th Cir. 1995), and like the federally-required maintenance of state driver's license records, *see* 49 U.S.C. § 30301 (National Driver Register), requires the expenditure of "time and effort on the part of state employees." *Reno v. Condon*, 528 U.S. 141, 150 (2000). While these federal statues, standing alone, do not violate the Constitution, *see Acorn, supra* (Voter Registration Act upheld pursuant to Art. I, Section 4 of Constitution providing Congress' authority to regulate time and manner of elections); *Condon, supra* (upholding provisions of the Driver's Privacy and Protection Act (DPPA) under the Commerce Clause),[24] when Congress and the federal courts mandate their use to effectuate policies in direct contravention of State policy, their use implicates the commandeering prohibitions of the Tenth Amendment. In rejecting an argument that the DPPA violates the Tenth

---

[23] The crux of Mr. Christensen's argument is that here these state resources are being commandeered by the federal government to pursue a goal that contravenes an important State policy, a situation not presented in the usual non-capital federal prosecution. Mr. Christensen thus does not argue that the Plan unconstitutionally requisitions state resources in non-capital cases.

[24] The Driver's Privacy and Protection Act regulates the disclosure or sale of personal driver's license information by a state Department of Motor Vehicles. *See* 18 U.S.C. §§ 2721-2725.

Amendment, *Condon* distinguished *Printz* because the Act "does not require state officials to assist in the enforcement of federal statutes regulating private individuals." 528 U.S. at 151. But here, like *Printz* and unlike *Condon*, state officials are being impressed into enforcement of a federal statute (FDPA) that regulates the conduct of private individuals - through the creation of the congressionally-required Jury Selection Plan and the "detailed instructions" that the Plan requires the Clerk to issue to state officials and local officials concerning the source lists for the Master Jury Pool.

C.  **The FDPA Violates the Commandeering Principles of the Tenth Amendment by Requisitioning Another State's Resources to Implement Federal Death Sentences Handed Down in States That Do Not Provide for the Death Penalty**

Employing mandatory language, 18 U.S.C. § 3596(a) provides a federal death sentence "shall" be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." In a non-death penalty State, § 3596(a) provides that the court shall designate a non-abolition State as the site of execution ("shall be implemented *in* [that State]) (emphasis added), and that, similarly, the execution "shall be implemented in the manner prescribed" by that State. The plain language, legislative history and prior practice governing the implementation of federal death sentences establish that Congress intended that the resources of the States would be requisitioned to carry out federal executions. Passed in 1996 before the Supreme Court's line of anti-commandeering cases (beginning with *Printz*), and over the explicit objections of the Department of Justice, this provision of the FDPA violates the Tenth Amendment, at

least as applied to federal death sentences returned in non-death cases.[25]

Congress' intent in enacting § 3596(a) is best informed by reviewing the practice followed in federal executions before passage of the FDPA. Prior to 1937, federal executions were performed in an *ad hoc* manner. *See generally,* U.S. Marshals Service, *History – Historical Federal Executions*, www.usmarshals.gov/history/executions.htm. In 1937, Congress specifically proscribed the manner of implementation of federal death sentences:

> The manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed. The United State marshal charged with the execution of the sentence may use available State or local facilities and the services of an appropriate State or local official or employ some other person for such purpose and pay the cost thereof in an amount approved by the Attorney General. If the laws of the State within which sentence is imposed make no provision for the infliction of the penalty of death, then the court shall designate some other State in which such sentence shall be executed in the manner prescribed by the laws thereof.

Pub. L. No. 156, 50 Stat. 304 (1937). The statute also directed that "[i]f the laws of the State within which sentence is imposed make no provision for the infliction of the

---

[25] While, as discussed below, the language of this section is most reasonably interpreted as directing that *all* federal executions be implemented in the State where the sentence was imposed, the actual situs language is only included for federal death sentences returned in abolition states. As noted, such sentences must be imposed "*in* the latter [designated] State." The second sentence of § 3596(a), which applies to sentences in non-abolition cases, does not contain a similar situs requirement. Here, Mr. Christensen is only concerned with the application of this section in abolition states such as Illinois, where the situs requirement results in the commandeering of another State's resources to carry out the execution– no less a violation of the Tenth Amendment than that of commandeering the resources of Illinois. Although strained, the second sentence of § 3596(a) could be read as authorizing the Marshall to carry out federal death sentences in non-abolition States in the manner required by that State without having to use State resources in contrast to the procedure for death sentences returned in abolition States, which mandate the use of another State's facilities.

penalty of death, then the court shall designate some other State in which such sentence shall be executed in the manner prescribed by the laws thereof." From the passage of the 1937 Act until the last pre-*Furman* execution, it appears that federal death sentences were, in fact, implemented in state facilities with the assistance of state personnel. *See* n. 26, *infra*.

The language employed in §§ 3596 and 3597 of the FDPA is almost identical to that of the 1937 Act, evidencing Congress' intent to adopt the same execution protocol as that set out in the latter and followed by the federal government after 1937 – that is, federal executions were to be implemented in state institutions with the assistance of state personnel. This intent is buttressed by the fact that in passing the FDPA Congress rejected a proposal from the Department of Justice that provided for executions in federal prisons using lethal injection and BOP personnel. *See* Letter of Attorney General Janet Reno to Honorable Joseph R. Biden, Jr., Detailed Comments at 3-4 (June 13, 1994) (recommending amendment "under which the execution of capital sentences in Federal cases" would be "carried out by Federal officials pursuant to uniform regulations issued by the Attorney General" and warning that the bill's "proposed procedures contemplate a return to an earlier system in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal Cases," *quoted* in House Rep. 104-23, 104th Cong. 1st Session, at 22 (1995-96); *see also* 137 Cong.Rec. S3191-02, 1991 WL 43650, 102 Cong. 1st Sess. (Mar. 13, 1991) (noting that proposed §§ 3596 and 3597 "reinstate the provisions of the 1937 law by providing for a U.S. marshal to "use State facilities" in implementing the sentence of

death.").

Thus, the available evidence suggests that Congress intended that the federal government would requisition state resources to implement the sentences of death imposed pursuant to the FDPA. While *Printz* rejected the idea that the Tenth Amendment makes an exception for "ministerial acts," 521 U.S. at 929, the state's participation in implementing a death sentence would, in any event, go well beyond minimal participation, involving the use of its facilities and personnel, who would have to assume various roles.[26] While this does not involve the requisition of resources of an abolition state such as Illinois, the result is the same. The FDPA contemplates that State government's resources will be required to carry out federal death sentences in violation of the anti-commandeering provisions of the Tenth Amendment.

---

[26] State personnel are likely to be involved in several aspects of executions under the FDPA, as suggested by reports of the procedures followed in federal executions pursuant to the 1937 Act. *See* H. Lee, *Julius and Ethel Rosenberg are Executed in 1953*, New York Daily News (6-18-2015, *reprint of article of June 20, 1953*), http://www.nydailynews.com/news/crime/rosenbergs-executed-1951-article-1.2259786 (visited 7-17-18) (recounting execution of Julius and Ethel Rosenberg in state prison of Sing Sing in New York and describing roles of Prison Chaplain, who walked the two to the execution chamber while intoning, "Though I walk in the valley of the shadow of death;" prison matron who comforted Ethel; the prison warden who, following "prison tradition," determined the order of execution; "hundreds of prison guards, state troopers, county and local police" present for security; and the fact that the "full prison staff of 290" was on duty or alerted for the execution); The Rage of Arthur Ross Brown, http://www.geocities.ws/mike_donnelly_umkc/042801Brown.html#_ftnref62 (visited 7-17-18) (describing execution of Ross Brown in Missouri state prison in 1956 for federal offense of kidnapping resulting in death after taking victim across state lines and killing her – prison chaplain accompanied Brown to the execution chamber; prison guards strapped him to the execution chair; and "director of penal institutions" pulled the level that released the deadly gases); *Last Man to Die, Who was Victor Feuger?*, Orlando Sentinel, June 9, 2001 (http://articles.orlandosentinel.com/2001-06-09/lifestyle/0106080426_1_bartels-victor-wife, (visited 7-17-2018) (recounting last federal execution pre-*Furman* of one Victor Feuger by hanging in Iowa penitentiary in 1963).

V.  **WHERE, AS HERE, INTERESTS FUNDAMENTAL TO THE INTEGRITY AND DIGNITY OF THE STATE OVERWHELMINGLY OUTWEIGH THOSE OF THE FEDERAL GOVERNMENT, THE TENTH AMENDMENT AND PRINCIPLES OF FEDERALISM PROHIBIT CONGRESS FROM OVERRIDING THE STATE'S POLICY JUDGMENTS REGARDING ITS INTERESTS**

A.  **Introduction**

"In determining whether the Tenth Amendment limits the ability of Congress to subject state governments to generally applicable laws, the Court *has* in some cases stated that it will evaluate the strength of federal interests in light of the degree to which such laws would prevent the State from functioning as a sovereign; that is, the extent to which such generally applicable laws would impede a state government's responsibility to represent and be accountable to the citizens of the State." *New York v. United States*, 505 U.S. 144, 177-78 (1992) (citations omitted)(emphasis in original). The federal government's pursuit of the death penalty here effectively overrides the decision of the elected representatives to abolish the death penalty in Illinois and "impedes [their] responsibility to represent and be accountable to the citizens" of Illinois.

The interests of Illinois in protecting its citizens, both as putative defendants and jurors in capital prosecutions, is magnified where the federal government is prosecuting a violent local crime, long regarded as falling squarely within the Police Power of the State. In contrast, the interest of the federal government in pursuing the death penalty is minimal in light of the absence of considerations unique to its sovereignty and the availability of life without parole. Where the relative interests are as lopsided as here,

principles of federalism and the Tenth Amendment precludes the federal government's attempt to override the will of the people of Illinois.

## B. The Interests of the State of Illinois

### (1) The State's Interest in Protecting the Lives of All Its Citizens

The essence of the Police Power reserved to the States is its duty to protect the "health, safety and welfare of its citizens." *Gonzales* v. *Raich*, *supra*. Stated otherwise, the Police Power represents the State's "broad authority to enact legislation for the public good." *Bond v. United* States, 134 U.S. 2077, 2086 (2014). At its core, it is the State's "unqualified interest in the preservation of human life." *Cruzan v. Director, Missouri Department of Health*, 497U.S. 261, 282 (1990). The protection of the lives of citizens legally residing within the state is as much a "defining characteristic of sovereignty" as the "power to exclude from the sovereign's territory people who have no right to be there." *Arizona v. United States,* 132 S. Ct. at 2511 (Scalia, J., dissenting). Thus, Illinois' very considered and deliberate decision that the imposition of capital punishment for a crime committed within its jurisdiction is no longer consonant with its values and its duty to protect the lives of all its citizens, even if not controlling in all cases, is entitled to great weight.

### (2) The State's Interest in Protecting Public Confidence in the Judicial System

Illinois also has an interest in protecting the reputation of and public confidence in the judicial system in the state. *Cf. Washington v. Glucksberg*, 521 U.S. at 731 (State of Washington's interest in "protecting the integrity and ethics of the medical

profession."). The sweeping media coverage of the miscarriages in the administration of capital punishment in the State, detailed above, ran the risk of generating public ridicule of, and disrespect for, the administration of justice, particularly with respect to public trust in the reliability of judicial procedures designed to take the life of one of its citizens. *See* n. 6, *supra* ("fosters a corrosive distrust."). That a federal rather than a state court is handing down the death sentence is a distinction unlikely to resonate with the public. *See also Motion to Declare Federal Death Penalty Act Unconstitutional Due to Unacceptable Error Rates* (filed 8-24-18).

(3) The State's Interest in Protecting Vulnerable Groups

Illinois also has an interest in "protecting vulnerable groups . . . from mistakes [and] prejudice." *See Washington v. Glucksberg*, 521 U.S. at 731-32. Illinois' rejection of the death penalty was jump-started by the exposure of consistent mistakes in sending innocent men to death row. Even if the mistakes were rare (which they were not), Illinois has a strong interest in avoiding the unthinkable execution of an innocent person. Its decision that even one such judicial misfire is unacceptable when it results in the wrongful taking of a life of one of its citizens is entitled to great deference. By taking the irrevocable penalty of execution off the table, Illinois furthers its interest in having the ability to at least partially correct mistakes whenever they occur and to assure its citizens that this is the case.

In rejecting the death penalty Illinois was also expressing its strong interest in protecting vulnerable defendants from the effects of prejudice and bias. It is no secret that the administration of capital punishment in this country at a minimum raises

serious questions as to racial, gender and geographical bias. See Report of the

Governor's Comm. On Capital Punishment, *supra,* at 196-197; Capital Punishment

Reform Study Committee, Sixth and Final Report, *supra*, at 132-34; *Defendant's Motion to*

*Strike Notice of Intent To Seek the Death Penalty on Ground That Capital Punishment Violates*

*the Eighth Amendment*, at **PAGES**. Irrespective of how these issues are resolved in an

individual case, Illinois has a strong interest in protecting capital defendants from these

vulnerabilities.

          (4)     The State's Interest in Protecting the Psychological Welfare of Its
                   Citizens as Potential Jurors

In prohibiting capital punishment in the state, Illinois was protecting the health

and welfare of another group of its citizens – the jurors who are called upon to make the

agonizing decision of whether to sentence another human being to death. No longer

does a citizen in Illinois have to wade into a tangle of legal and ethical considerations

for which they may well feel ill-equipped and which have the potential for serious

psychological consequences. In considering applications for stays in capital cases,

Former Governor Ryan remarked on the difficulty of "hold[ing] in your hands the life

of any person." *See Warden, supra*, at 260. Others have said the same. Former California

governor Pat Brown, who considered and denied several applications for clemency

(while granting others) has recounted the toll such decisions took on him:

> It was an awesome, ultimate power over the lives of others
> that no person or government should have, or crave. And
> looking back over their names and files now, despite the
> horrible crimes and the catalog of human weaknesses they
> comprise, I realize that each decision took something out of
> me that nothing – not family or work or hope for the future –

has ever been able to replace.

Edmund G. "Pat" Brown with Dick Adler, *Public Justice, Private Mercy*: A Governor's

Education on Death Row 44 (New York: Weidenfeld and Nicholson,1989), *quoted in*

Paula Mitchell, *The Weight of Capital Punishment on Jurors, Justice, Governors, and*

*Executioners*, *available at* https://verdict.justia.com/2013/10/25/weight-capital-

punishment-jurors-justices-governors-executioners (visited 7-18-18). Justice Ginsburg

has offered similar comments concerning last-minute stay applications, describing them

as the "hardest part of the job I do" and a "dreadful part of the business."

http://abcnews.go.com/blogs/politics/2011/09/ruth-bader-ginsburg-death-penalty-

gender-equality-and-that-elephant-ride-with-scalia.

These reactions reflect the experiences of professional politicians and legal

professionals who are often charged with making life-or-death decisions. It is hardly

surprising that the effect on lay citizens who are suddenly called into the public arena to

make such decisions can be even more momentous. *See* Dr. Carla Morgan, Living with

PTSD After Serving as a Juror, Interview, Nov. 11, 2012, (describing PTSD symptoms

often influenced by capital jurors after service), *available at*

http://obviousanswers.presspublisher.org/issue/fall-2012/article/living-with-ptsd-

after-serving-as-a-juror; Clarence Watson, JD, Spencer Eth, MD and Gregory B. Leong,

MD, *Commentary: Pursuing Justice in Death Penalty Trials*, 40 J Am Acad Psychiatry Law,

50 51-52 ("The scientific literature confirms that jurors experience stress-related

symptoms that are amplified in capital trials . . . [and] . . .jurors may be profoundly

affected by their experience even years after the trial."), *available at*

http://www.jaapl.org/content/40/1/50.full.pdf (visited 7-18-18); Robert Schopp,

Richard L. Wiener, Brain H. Bernstein, Steven L. Willborn, Mental Disorder and

Criminal Law: Responsibility, Punishment and Competence 61 (Springer Science &

Business Media 2008) (citing studies that when the death penalty is at stake, juror stress

levels are higher than in non-capital cases, even when the facts of the cases are

comparable."); Paula Mitchell, *The Weight of Capital Punishment on Jurors, Justices,*

*Governors, & Executioners*, Justicia, p. 2, Oct. 25, 2013 (quoting conclusion of social

worker who has debriefed and counseled jurors in death penalty cases for over a

decade that for some jurors the experience "results in a variety of symptoms related to

post- traumatic stress, and the problem may remain with them for a long time . . . the

trauma is not mitigated and may even be exacerbated when the defendant's execution

occurs."), *available at* https://verdict.justia.com/2013/10/25/weight-capital-

punishment-jurors-justices-governors-executioners (visited 7-18-18). Another study has

shown that interviews of 1,200 jurors from 353 capital trials revealed that 62.5% of the

female jurors and 37.5% of male jurors sought counseling afterwards and 81% of the

female jurors and 18% of the males later regretted their decisions. *Id.*

   While juror stress is likely present to some extent in all trials, Illinois has a strong

interest in removing the potential trauma inherent in juror service in a capital case. And,

of course, although Mr. Christensen will be tried in federal court, the jurors who will be

called upon to decide his fate are citizens of Illinois.

(5) The State's Interest in Ensuring All Its Citizens Can Participate as Jurors

Illinois' decision to abolish the death penalty also reflects its strong interest in protecting the rights of its citizens as jurors in another way. "Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civil life." *Powers v.* Ohio 499 U.S.400, 402 (1991). The death-qualification procedure in a capital case excludes a large number of jurors who would otherwise be qualified to serve. *See* Richard C. Dieter, *A Crisis of Confidence: Americans Doubts About the Death Penalty*, at 2, Death Penalty Information Center, June, 2007 (reporting poll results "that nearly 40% of the public believes that they would be disqualified from serving on a jury in a death penalty case."), http://www.deathpenaltyinfo.org/CoC.pdf (visited 8-8-18). Setting aside the argument that death qualification unfairly skews toward guilt, these jurors are cut out by means of a process which says they are not entitled to sit as jurors in a particular case because of their otherwise protected views about an issue of public importance and concern. Illinois has a strong interest in ensuring that the right of its citizens to sit as jurors not be abridged in this manner.

More particularly, Illinois has an interest in ensuring that the exercise of fundamental religious beliefs by its citizens, guaranteed by Section 3 of the State's Constitution and its statutes,[27] do not disqualify them from participation in jury service

---

[27] "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed, and no person shall be denied any civil or political right, privilege or capacity, on account of his religious opinions; but the liberty of conscience hereby shall not be construed to dispense with oaths or affirmations . . . ". Constitution of the State of Illinois, Article I, Section 3.; and the State's

in cases in which the ultimate decision is essentially a "moral" judgment. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (jury must assess the "defendant's moral culpability and blameworthiness"); *Caldwell v. Mississippi*, 472 U.S. 320, 340, n. 7 (1985) (jurors' determination in a capital case of what is essentially a "moral judgment" cannot be effectively reviewed by an appellate court); *United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013) (the ultimate determination under the FDPA of whether the aggravating factors outweigh the mitigating factors "is not a finding of fact, but a moral judgment."). *Cf. McCreary County Kentucky v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 887 (2005)("Those who wrote the Constitution believed that morality was essential to the well-being of society and that encouragement of religion was the best way to foster morality.")(J. Scalia, dissenting).

A large number of this State's citizens have deep-seated religious beliefs that, if followed, may prevent them from sitting in a capital case and having their moral judgment as a citizen heard. Just within the past few weeks the Pope has emphasized the Catholic Church's opposition to the death penalty, noting that it is unacceptable in all cases and an attack on human dignity. *See* Elisabeth Povoledo and Laurie Goodstein, Pope Francis Declares Death Penalty Unacceptable in All Cases), NY Times, Aug. 2, 2018, https://www.nytimes.com/2018/08/02/world/europe/pope-death-penalty.html (visited 8-6-18). Polls reveal that approximately 31% of the population of Illinois are Catholic. *See* https://news.gallup.com/poll/12091/tracking-religious-

---

Religious Freedom Restoration Act, 775 ILCS 35/1 (1998).

affiliation-state-state.aspx (visited 8-6-18). Regardless of the constitutionality of excluding jurors with religious beliefs that would prevent them from imposing a sentence of death, the State of Illinois has an interest in ensuring that its citizens are not put to the choice of slighting these personal beliefs and transgressing their Church's catechism in order to exercise the privilege of jury service.

> (6)   The State's Interest in its Resources Not Being Used to
>        Countermand Important Public Policies of the State

Illinois also has an interest in its state resources not being used in a manner incompatible with its goals. Here, its resources are mustered in several ways in the federal government's mission to take the life of one its citizens in a manner which the State has expressly renounced. This directly impacts on state sovereignty. *See* IV, *supra*; *Printz*, 521 U.S. at 922 (financial benefits to federal government in using state resources to pursue federal goals). The discovery suggests the extent that resources of the State of Illinois are being called upon by the federal government in pursuit of a goal discordant with the policies of the State. The defense has, at a minimum, close to a thousand pages of reports of state agencies reflecting the sweeping involvement of the Illinois State Police and the University of Illinois Police in the investigation of this case. Among other efforts, state agencies interviewed witnesses, meticulously canvassed numerous businesses in Champaign and Urbana for evidence and videos, spent untold hours reviewing videos, visited hotels in the area, participated in searches and processing of various locations, conducted grid and canine searches, investigated tips and applied for numerous search warrants.  This involved an enormous use of the resources of the State

of Illinois. Mr. Christensen does not contend that this use of state resources in a federal criminal trial invariably constitutes a *per se* violation of the commandeering prohibition of the Tenth Amendment but, as *Printz* recognizes, the States have a recognizable interest in the federal government's not using its resources to accomplish goals antithetical to the expressed policy of the State.

(7)    The State's Interest as a Respected Sovereign

Finally, by virtue of our national compact alone, Illinois has an appreciable interest in the federal government respecting its judgment on meaningful state policy. "At least as far back as *Martin v. Hunter's Lessee,* 1 Wheat. 304, 324, 4 L.Ed.97 (1816), . . . questions 'of great importance and delicacy' [have been presented] whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." *New York v. United States*, 505 U.S. 144, 155 (1992). The issue of the death penalty is precisely such a question of "great importance and delicacy."

As noted, "[T]he Constitution. . . contemplates that a State's government will represent and remain accountable to its own citizens." *Printz*, 521 U.S. at 922. In abolishing capital punishment Illinois was doing precisely that.

**C.    The Federal Interest**

Measured against the strong interests of Illinois, the federal interest pales.

(1) This Case Does Not Involve the Federal Government's Interest in Protecting its National Officers or Foreign Policy, Terrorism or Other Unique Interests

First, unlike a large number of federal statutes that provide for the death penalty, the interests unique to the federal government are not in play here. *See e.g.*: 18 U.S.C. § 351 (murder of members of Congress, certain executive officials or Supreme Court justices); § 1114 (officers or employees of the United States engaged in official duties); § 1116 (murder of foreign officials, official guests or internationally protected persons); § 1751 (death during kidnaping or assassination attempt on the President or Vice-President); § 1111 & 7 (murders within the special maritime and territorial jurisdiction of the United States; § 794 (espionage); § 2381 (treason)[28]; 2332 (terrorist murder of a U.S. nationalist in a foreign country). While the list is not exhaustive, these statutes implicate the national government's heightened interest in protecting its officers and territorial jurisdiction, as well as other interests uniquely assigned to the federal government. A killing in the course of a kidnapping where the victim is not transported across state lines does not implicate such unique interests. *See Defendant's Motion to Dismiss Count One for Lack of Jurisdiction* (filed August 24, 2018). Unlawful killings, whether classified as murder or felony-murder, are against the laws of, and severely punished by, every state, including Illinois.[29]

---

[28] While treason and espionage are matters of unique importance to the national government, in the absence of resulting deaths, it is not clear that imposition of the death penalty for these offenses survives *Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008), *as modified in denial of Petition for Rehearing*, 554 U.S. at 945 (2008)(Eighth Amendment bars death penalty for rape where the offense did not result, and was not intended to result, in death).

[29]*See* ILCS 5/10-2: Aggravated kidnapping (in addition to kidnapping sentence, mandatory additional 15 years for aggravated kidnapping); 720 ILCS 5/9-1 and ILCS 5/5-4.5-20: (providing for sentence of natural life imprisonment for first degree murder). In addition, felony-murder is punished as first degree murder. *See People v. Hudson*, 856 N.E. 2d 1078 (Ill. 2006)

(2) Commerce Clause Jurisdiction

Even though kidnapping, murder and felony-murder are all severely punished crimes under Illinois law, Mr. Christensen does not suggest that Congress lacks power under the Commerce and Necessary and Proper Clauses, U.S. CONST., art. I, § 8, cl. 3, 18, to criminalize and punish such crimes in appropriate cases. Rather, he contends that any marginally incremental interest the government may have under either Clause in obtaining a sentence of death rather than life without parole is constitutionally diminished when, as here, it impinges on a State's sovereignty and its unique and particularized interests and where the asserted federal jurisdictional basis is, at best, tenuous.

Congress' power under the Commerce Clause has "judicially enforceable outer limits." *United States v. Lopez*, 514 U.S. at 566; *United States v. Morrison*, 529 U.S. at 608 (2000)("[E]ven under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds."). The scope of the Commerce Clause power "is necessarily one of degree." *Lopez*, 514 U.S. at 555, *quoting Jones & Laughlin Steel*, 301 U.S. 1, 37 (1937). The striking down of the Gun- Free School Zones Act in *Lopez*, and the Violence Against Women Act in *Morrison* reflect limitations imposed on Commerce Clause jurisdiction and illustrate the Constitution's rejection of a general federal police power. *See Gonzales v. Raich*, 545U.S. 1, 44 (2005)(O'Connor, J., dissenting).

In both *Lopez* and *Morrison*, the Court was "conscious of the danger . . . to obliterate the distinction between what is national and what is local," posed by overly

expansive interpretations of Commerce Clause jurisdiction. *Gonzales,* 545 U.S. *at* 35-36

(Scalia, J., concurring).

> And there are other restraints upon the Necessary and
> Proper Clause authority. As Chief Justice Marshall wrote in
> *McCulloch v. Maryland*, even when the end is constitutional
> and legitimate, the means must be "appropriate" and
> "plainly adapted" to that end. [citation omitted]. Moreover,
> they may not be otherwise "prohibited" and must be
> "consistent with the letter and spirit of the Constitution.
> [citation omitted]. These phrases are not merely hortatory.
> For example, cases such as *Printz v. United States*, [citation
> omitted], and *New York v. United States*, [citation omitted],
> affirm *that a law is not "'proper for carrying into Execution the
> Commerce Clause,'" "[w]hen [it] violates [a constitutional
> principle of state sovereignty".* [citations omitted].

*Id.* at 39 (Scalia, J., concurring)(emphasis added); *id.* at 52 ("Congress must use its

authority under the Necessary and Proper Clause in a manner consistent with basic

constitutional principles . . . [it] cannot use its authority under the Clause to contravene

the principle of state sovereignty embodied in the Tenth Amendment.")(O'Connor, J.,

dissenting).[30]

---

[30]     In *United States v. Comstock*, 560 U.S. 126 (2010), the Court analyzed five factors in determining
whether the Necessary and Proper Clause provides authority for the detention of certain defendants
beyond the date they would otherwise be released pursuant to a federal sexually dangerous offender
statute. These factors constrain any constitutional support for the FPDA under the facts of this case.

 *Comstock* first cited Congress' broad power to define criminal conduct and imprison those who
violate those laws. *Id.* 133-137. As stated above, Mr. Christensen does not challenge Congress' power to
criminalize kidnappings where the victim is transported across state lines or the defendant travels across
state lines to commit the offense. *See Motion to Dismiss Count One for Lack of Jurisdiction* (filed August
24, 2018). Second, *Comstock* noted that the civil-commitment statute constituted only a "modest
addition" to existing mental health statutes. *Id.* 137-142. Passed in 1994, the FDPA can hardly be termed
a "modest-addition" to existing statutes. Third, the Court noted that Congress was entitled to incarcerate
sexually dangerous predators regardless of the expiration of their sentences to protect the public. Id. 142-
143. Here, the availability of life-without-parole adequately accomplishes the same.

 Fourth, *Comstock* noted that the statute "properly accounts for state interests" and does not
"invade state sovereignty." *Id.* 143-46. In so finding, the Court noted that the federal sexual offender
commitment statute actually *accommodates* the State's interests by requiring the Attorney General to
inform the State that it may wish to assert its authority to detain the individual and should, in fact,

These principles hold deeper force when Congress is using the Commerce Clause to regulate violent crimes which traditionally have fallen within the State's Police Power, a focus that becomes even sharper where Congress is attempting to prohibit an activity that the Founding Fathers likely never would have imagined being within the ambit of the national government. *See Morrison*, 529 U.S. at 618. When the First Congress enacted nationwide criminal statutes in 1790, it did not rely on any purported Commerce Clause jurisdiction but only on "direct grants of authority found in the Constitution," such as its territorial jurisdiction. *Lopez*, 514 U.S. at 596-7, n. 6 (Thomas, J., concurring). Nothing suggests an intent of the Framers to sanction a jurisdictional grab by the national government to the extent suggest here.[31]

Mr. Christensen' point is that when the federal government asserts Commerce

---

encourage the State to do so. The statute also provides that if the State at any time asserts its authority over the individual, he or she must be immediately transferred to State custody. *Id*. 144-145. But, as Mr. Christensen has demonstrated herein, the federal government's attempt to use the death penalty in no way accommodates the interests of the State of Illinois. And, it goes without saying that, unlike *Comstock*, the FDPA provides no mechanism for the State to remove Mr. Christensen from federal custody to accomplish its policy of abolishing capital punishment in the state. Fifth, and last, *Comstock* emphasized the statute's "narrow scope," i*d* at 148, a characterization that cannot reasonably be attached to the FDPA.

Finally, in evaluating the federal government's attempt to grant itself broad jurisdiction on such a theory, "[i]t is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause." *Id*., at 153 (Kennedy, J., concurring in judgment).

[31] Although not enacted by the "Founding Fathers," the first ten amendments to the Constitution, ratified in 1791, reflect the understanding of the times that the power of the national government would be restricted where it otherwise might tend to entrench on that of the States. Each of the "rights" guaranteed in the Bill of Rights were couched in terms of, and understood as, solely placing limitations on the power of the *federal* government, an understanding that held until the 20th century when the Supreme Court began to selectively incorporate the Bill of Right into the Due Process Clause of the Fourteenth Amendment, thereby making them applicable to the States. *See* Robert F. Cushman, Incorporation Due Process and the Bill of Rights, 51 Cornell Law Review, Issue 3, Spring 1966, available at https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?referer=https://www.bing.com/&httpsredir=1&article=2466&context=clr (visited 8-2-18).

Clause jurisdiction in a case such as this it quickly approaches the boundaries of its authority. Regardless of whether it has crossed the jurisdictional line (and Mr. Christensen contends that it has), the federal government's interest in pursuing the death penalty must be accorded far less weight than if jurisdiction is asserted on the basis of more uniquely federal interests, such as those outlined above. Irrespective of whether these principles, standing alone, bar the federal government's attempt to impose the death penalty in this case, at a minimum they suggest the government's diminished interest in seeking in seeking death rather than life without parole in the face of the State's strong interests otherwise.

(3) The Alternative of Life Without Parole

Life without parole (LWOP) is "the second most severe penalty permitted by law." *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991). The sentence is physically incapacitating, mentally crippling and as close to death as the Eighth Amendment permits:

> L]ife without parole sentences share some characteristics
> with death sentences that are shared by no other sentences.
> The State does not execute the offender sentenced to life
> without parole, but the sentence alters the offender's life by a
> forfeiture that is irrevocable. It deprives the convict of the
> most basic liberties without giving hope of restoration,
> except perhaps by executive clemency – the remote
> possibility of which does not mitigate the harshness of the
> sentence. [citation omitted]. As one court observed in
> overturning a life without parole sentence for a juvenile . . .
> this sentence "means denial of hope; it means that good
> behavior and character improvement are immaterial; it
> means that whatever the future might hold in store for the
> mind and spirit of [the convict], he will remain in prison for
> the rest of his days." [citation omitted].

*Graham v. Florida*, 560 U.S. 48, 69-70 (2010).

In light of the availability of LWOP, the only cognizable interest the federal government can assert here is its unsound insistence on a sentence of death. *Cf.* United States Attorney's Manual, § 9-2.031 – Dual and Successive Prosecution Policy ("Petite Policy), Subsection D (presumption of no successive federal prosecution overcome where state sentence was "manifestly inadequate" or "trivialized" the federal offense.)[32] It cannot proffer a financial justification, as unseemly as that otherwise would be, as the data strongly suggests that a capital prosecution with its associated trial, appeal and post- conviction costs is far more of a burden on the national treasury than the alternative. *See Considering the Death Penalty: Your Tax Dollars at Work*: Forbes, Apr. 30, 2014 (citing statistics showing significantly higher costs both in death penalty litigation and expenses associated with death rows as opposed to sentences of life without parole), *available at*

http://www.forbes.com/sites/kellyphillipserb/2014/05/01/considering-the-death-penalty-your-tax-dollars-at-work/. And, as discussed in Mr. Christensen' *Motion to Strike the Notice of Intent to Seek the Death Penalty On Ground that Capital Punishment Violates the Eighth Amendment*, at **_PAGES_**, justifications based on deterrence or retribution add little weight, especially when stacked against the State of Illinois' interest.

---

[32] Mr. Christensen recognizes that this federal prosecution is not a successive one within the meaning of the non-enforceable Petite Policy. *See United States v. Hutul*, 416 F.2d 607 (7th Cir. 1969). The point is that there is nothing "manifestly inadequate" or "trivial" about a sentence of life without parole.

### D.   This Overwhelming Imbalance of Interests Between the State of Illinois and Those of the United States Implicates the Principles of Federalism Underlying our Constitutional Compact.

To hold that the federal interest overrides any consideration of Illinois' interests, no matter how strong the latter or relatively minimal the former, is tantamount to a rejection of the basic tenets of federalism.

> "This federalist structure of joint sovereigns preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting States in competition for a mobile citizenry".

*Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991); *Bond v. United States*, 564 U.S. 211, 221-22 (2011) ("Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power."); *cf. The Federalist No. 46*, at 304 (C. Rossiter ed. 1961) (James Madison)(federalism enables the State to enact policies "unfriendly to the national government" but "generally popular in the State."). Breathing life into this fundamental demarcation of authority requires that "[f]ederal legislation threatening to trench on the States' arrangement for conducting their own government should be treated with great skepticism." *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004).

The Supreme Court has also specifically noted that principles of federalism require a degree of deference to state legislatures' decisions concerning the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 186-187 (1976) ("*Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular state, the moral consensus concerning the death penalty* and its social utility as a sanction, require us to conclude . . . )(emphasis added); *cf. McClesky v. Kemp*, 481 U.S., 279, 305 (1987)("[W]here the objective indicia of community values have demonstrated a consensus that the death penalty is disproportionate as applied to a certain class of cases, we have established substantive limitations on its application."). If the federal government is permitted to effectively nullify the judgment of the State of Illinois under the facts of this case, the concept of dual sovereignty, as envisioned by the founders, is little more than a constitutional will-o'-the-wisp.

## VI.    CONCLUSION

While not dispositive in and of itself, Illinois' experience with the death penalty and its resulting abolition reflects the lifeblood of the political process, where an issue of the utmost public interest is robustly debated and resolved by the democratic process, here resulting in the its elected officials' conclusion that justice in Illinois – and the interests of its citizens – is best served by putting an end to capital punishment in the State. This is the very core of the political processes of the State. Just as the authority of States to determine the qualifications of its most important officials "lies at the heart of representative government," *Gregory*, 501 U.S. at 463, so too the legislative and executive decisions promulgated by those officials. "[P]ersons holding state elective

[offices] . . . [who] participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." *Sugarman v Dougall*, 413 U.S. 634, 647 (1973). These principles came to the forefront when the Supreme Court struck down the Federal Defense of Marriage Act (DOMA) in *United States v. Windsor*, 133 S. Ct. 2675 (2013). There, the Court punctuated the importance accorded the State's political processes when a conflict arises between state and federal law involving fundamental rights that are the subject of intense public interest and debate, terming those state processes the "beginning point in deciding" the constitutionality of DOMA. *Id*. 2689.

> After a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same-sex marriage, New York acted to enlarge the definition of marriage to correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood.
> *Ibid*.

This description precisely mirrors the history of the abolition of the death penalty in Illinois described herein at pages 5-20. After two decades of highly-publicized miscarriages of justice in administering the death penalty in Illinois, resulting in the appointment of and recommendations by Executive and Legislative blue-ribbon commissions, the elected officials of Illinois determined that the interests of both the public in combatting violent crime and victims in receiving justice would not be compromised by abolition of the death penalty. Under the circumstances of this case, this is a decision that the Tenth Amendment requires the federal government to respect.

WHEREFORE, the Defendant respectfully requests that this Court find that the

Federal Death Penalty Act is unconstitutional as applied to this case.

Respectfully submitted,

/s/Elisabeth R. Pollock                    /s/ George Taseff
Assistant Federal Defender                 Assistant Federal Defender
300 West Main Street                       401 Main Street, Suite 1500
Urbana, IL 61801                           Peoria, IL 61602
Phone: 217-373-0666                        Phone: 309-671-7891
FAX:   217-373-0667                        Fax:     309-671-7898
Email: Elisabeth_Pollock@fd.org            Email: George_Taseff@fd.org


/s/ Robert Tucker                          /s/ Julie Brain
Robert L. Tucker, Esq.                     Julie Brain, Esq.
7114 Washington Ave                        916 South 2nd Street
St. Louis, MO 63130                        Philadelphia, PA 19147
Phone: 703-527-1622                        Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com           Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org
