Suzanne L. Elliott
Law Office of Suzanne Lee Elliott
1300 Hoge Building
705 Second Avenue
Seattle, WA 98104-1705
(206) 623-0291
suzanne-elliott@msn.com

Mark A. Larrañaga,
Walsh & Larrañaga
140 Lakeside Ave., Suite #338-A
Seattle, WA 98122
(206) 972-0151
Mark@jamlegal.com

Theresa M. Duncan
Duncan Earnest, LLC
222 East Marcy Street
Suite 1
Santa Fe, NM 87501
505-710-6586
teri@duncanearnest.com

Attorneys for Defendant John P. Smith

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 3:16-cr-0086-SLG |
| JOHN PEARL SMITH, II, | |
| Defendant. | |

**MOTION TO MODIFY JURY QUESTIONNAIRE (DKT. 771)**

Defendant John Pearl Smith, II, respectfully asks this Court to modify the prospective juror questionnaire (Dkt. 771), to include questions necessary to elicit potential jurors' views on critical issues and the impact (if any) of the COVID-19 pandemic on their ability to serve.

### FACTUAL BACKGROUND

On January 24, 2019, this Court filed its proposed special juror questionnaire.[1] Dkt. 308. Both parties responded with suggested changes. Dkt. 372 (government response); Dkt. 568 (defense response). On March 13, 2020, the Court filed the final questionnaire, which was mailed to prospective jurors. Dkt. 771 (sealed). Due to the COVID-19 pandemic, however, trial was continued and the jurors summoned for service were dismissed. Dkt. 935.

Under the Court's current scheduling order, jury selection is scheduled to begin September 13, 2021, and potential jurors are scheduled to complete the special questionnaire at the courthouse during the week of June 21, 2021. *Id*.

### REQUESTED MODIFICATIONS

Mr. Smith seeks modification of, and additions to, the Court's proposed special questionnaire's introductory paragraphs and questions related to these areas: (1) brain impairments, (2) mitigation bias, (3) knowledge of this case, (4) views on the death penalty, (5) substitution of counsel; (6) a defendant's constitutional rights, (7) the current political climate, and (8) the COVID-19 pandemic.

---

[1] At the time the Court filed its proposed questionnaire, trial was scheduled to begin October 1, 2019. Trial (opening statements and the presentation of evidence) is now scheduled to begin October 18, 2021 (Dkt. 935).

**A.      Case Summary (Dkt. 771-1 at 2).**

The case summary provides an overview of the allegations against Mr. Smith. He requests that the Court modify the first two sentences of the second paragraph of the summary as follows:

> The government ~~has alleged~~ alleges ~~that during~~ Mr. Smith premeditated a home invasion robbery in Wasilla on June 5, 2016, intentionally killing Ben Gross and Crystal Denardi ~~were each shot by Mr. Smith and~~ who died from their gunshot wounds. A third person was also shot but survived.

It is important that prospective jurors understand Mr. Smith is charged with committing intentional, premeditated murders when answering questions—particularly questions regarding their views on the death penalty. *See, e.g.*, Dkt. 771-1 at 27 (Qs. 75 and 76 (asking for views re LWOP and the death penalty for "intentional premeditated murder cases"). Otherwise, jurors are likely to mistakenly include within the scope of potentially capital murders killings done with lesser intent or with imperfect defenses.[2] Such a mistake likely would skew jurors' opinions on the appropriateness of the death penalty. For example, a juror who could not consider mitigating evidence in the case of intentional, premeditated murder, might be able to consider it in a second-degree or manslaughter case. Thus, a mitigation-impaired juror (*i.e.* a juror with a bias against considering mitigation in a

_____

[2] Based upon interviews with actual capital jurors, one scholar concluded that jurors who say that the appropriate punishment would "depend on the circumstances" are "thinking of 'circumstances' that would make the act or incident a killing in self-defense, an accident, an act in the 'heat of passion,' a product of insanity; that is, they are thinking of circumstances that would make the crime not a murder at all, let alone a capital murder." John Blume et al., *"Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1244-45 (Summer 2001) (concluding, based on interviews conducted by the Capital Jury Project, that "[t]he complexity of death-penalty law means that jurors often don't understand what they're being asked, when asked whether they could consider both sides, follow the law or consider both a life sentence or the death penalty").

particular type of homicide case) might incorrectly report they would consider mitigation in a capital case when in fact they would not.

When a prospective juror is not given the appropriate context and background before being asked questions about their views on punishment and mitigation, it is a common phenomenon for the juror's responses – while truthful and candid – to ultimately be unreliable and misleading for purposes of evaluating the juror's qualifications to serve. A prospective juror questioned in *United States v. Beckgrod et al.,* No. 3:96-cr-66 (E.D. Va. 1997) provides an excellent example of this problem. (This transcript is filed in the instant case at ECF 565-1.) She responded affirmatively to questions by the judge and prosecutor about her willingness to consider aggravation and mitigation and her ability to follow the court's instructions, stating "I think I would have to consider them, yes." ECF 565-1 at 5. She further agreed that she would not impose the death penalty automatically, but "would consider both options, both sides" and be "a fair and impartial juror." *Id*. at 7. Once the process was more carefully explained, her response changed:

> DEFENSE COUNSEL: If the jury found one of the defendants, one or more of them, guilty of the following crime: A knowing, intentional, and unlawful murder in furtherance of a conspiracy to distribute crack cocaine. . . would you then, regardless of the aggravating or mitigating circumstances, believe that the death penalty was the only appropriate punishment for that crime?

> VENIREPERSON: I think I would have to vote for the death penalty if it was a knowing crime, based on my religious beliefs, yes.

> DEFENSE COUNSEL: Okay. That is based on religious beliefs?

> VENIREPERSON: Right.

> DEFENSE COUNSEL: So that the crime that is at issue here you would believe that that would be the only appropriate punishment, am I correct?

> VENIREPERSON: Right.

*Id*. at 8-9. When the Government sought to clarify the venireperson's prior answers, she explained,

> VENIREPERSON: He [defense counsel] explained it to me I think a little better. He read the whole thing there, and I understood more about what the question was when he read it. I am having a little problem with aggravating and mitigating here, so I what he said, the whole crime, I can answer my question from—

*Id*. at 9. When the Government clarified that the offense involved was an intentional killing, the venireperson clarified that "[b]ased on my religious beliefs, if it was a knowing crime, committed by someone who knew what they were doing, I would vote for the death penalty." *Id*. at 10. The parties then stipulated that the juror should be excused for cause. Without an explicit case-specific explanation, it appears that this juror would have unintentionally misled the parties and the court about her constitutionally disqualifying bias.

In order to protect a capital defendant's right to a fair trial, a juror must be removed for cause if the juror's views in favor of the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Morgan v. Illinois*, 504 U.S. 719, 728-729 (1992) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The *Morgan* Court "reiterate[d]" that a juror, who would "automatically" impose a death sentence following conviction for murder is properly excluded under this standard. 504 U.S. at 729, 736. Such jurors are properly excused because they "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id*. at 736. *Morgan* recognizes that a broad

range of mitigation-impaired jurors are constitutionally unqualified. As Justice Scalia pointed out in his dissent:

> [I]t is impossible in principle to distinguish between a juror who does not believe that any factor can be mitigating from one who believes that a particular factor–e.g., "extreme mental or emotional disturbance[]"–is not mitigating. (Presumably, under today's decision a juror who thinks a "bad childhood" is never mitigating must also be excluded.)

*Id.* at 744, n.3 (emphases in original). "In other words, the class of mitigation-impaired— and constitutionally unqualified—jurors include not only those who are unable or unwilling to ever consider any form of mitigation, but also those who are either unable or unwilling ever to consider a particular mitigating factor." John Blume, et. al, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA LAW REV. 1209, 1218 (2001).

**B.      Questions Related to Brain Impairments (Dkt. 771-1 at 14-15, 28).**

The Court's questionnaire includes questions seeking prospective juror's experiences with mental illness, brain injuries, and brain or cognitive impairments. Dkt. 771-1 at 14-15, 28. Mr. Smith requests amendments to these questions to include information regarding brain impairments and mental health, regardless of the etiology of the impairment or whether a mental health issue rises to the level of a "mental condition" and to exclude specific examples in the questions. To that end, he requests that the Court amend Questions 38 and 39 as follows:

> 38. Have you, a family member, or anyone close to you had any type of brain ~~or head injury, a TBI (traumatic brain injury), and/or concussion~~ impairment?
> …
>
> 39. Have you, a family member, or anyone close to you been tested, diagnosed or treated for any type of brain impairment or cognitive limitation, intellectual or learning disability, or any other similar deficit or disability (~~e.g., dyslexia, autism, senility, Alzheimer's~~)?

…

He further requests that the Court amend Questions 82(o) and (q):

o.     A defendant's ~~head injuries and mild traumatic brain injury~~ brain impairments

q.     A defendant's mental ~~condition~~ health issue (not rising to insanity)

The phrase "brain impairment" is broad and includes mental symptoms and deficits that may be mitigating, without regard to etiology or diagnoses. It is important that the questionnaire elicit information regarding jurors' willingness and ability to consider a broader category of brain impairments since such impairments may or may not be linked to head injuries or TBI.

Similarly, Mr. Smith requests that the Court substitute "mental health" for "mental condition." The phrase "mental condition" is arguably synonymous with "mental illness," which includes a range of conditions for which there are standard criteria used to diagnose them, such as depression, anxiety and substance use disorders. "Mental health," by contrast, is "a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community." World Health Organization (WHO), "WHO urges more investments, services for mental health," available at https://www.who.int/mental_health/who_urges_investment/en/. A mental health issue, such as stress, can affect an individual's ability to function without rising to the level of a mental illness or condition[3] and is relevant mitigation. *See, e.g., Saad v. S.E.C.*, 718 F.3d 904, 913 (D.C. Cir. 2013) (in the context of disbarment, recognize personal stress as a mitigating

---

[3] Of course, if a mental health issue such as stress is intense or allowed to continue unrestrained, it can lead to a mental illness such as anxiety or depression.

DEFENDANT'S MOTION TO MODIFY JURY QUESTIONNAIRE- 7

*U.S. v. SMITH*, NO. 3:16-CR-0086-SLG-DMS

factor and remanding case because SEC failed to consider appellant's stress in deciding to impose a lifetime ban). Mr. Smith is entitled to learn whether prospective jurors will give meaningful consideration to evidence of mental health issues as mitigation, regardless of whether those issues rise to the level of a mental illness. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("A careful review of our jurisprudence in this area makes clear that … sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual[.]").

Finally, Mr. Smith asks the Court to add the parenthetical "(not rising to insanity)" to clarify that jurors are being asked about mental health issues which may be relevant to mitigation but are not being raised as a defense to the charged offense and do not rise to the level of insanity (*i.e.* the mental health issues would not excuse his legal culpability and guilt). This clarification will increase the reliability and usefulness of jurors' answers to this question, as it will more accurately elicit a jurors' views regarding the expected mitigation evidence.

**C. Questions Related to Mitigation Biases.**

In his proposed changes to the Court's original proposed questionnaire (Dkt. 568-1), Mr. Smith asked the Court to include several questions designed to elicit jurors' potential biases against mitigation evidence related to a defendant's childhood experiences. Dkt. 568-1 at 15-16 (Qs. 48-49), 29 (Qs. 98-99), and (Qs. 102(q)-(t), (w)-(y), and (aa))). The Court did not include any of these questions in its final questionnaire, although it did include a question asking how much importance a prospective juror would attach to a "defendant's unstable childhood" in deciding between life without the possibility and death. Dkt. 771-1 at 28 (Q. 82(m)).

DEFENDANT'S MOTION TO MODIFY JURY QUESTIONNAIRE- 8

*U.S. v. SMITH*, NO. 3:16-CR-0086-SLG-DMS

A jury must be able to consider and give mitigating effect to evidence that a defendant suffered abuse as a child. *See Penry v. Johnson*, 532 U.S. 782, 787 (2001) (reversing death sentence in part because jury was never instructed that it could consider and give mitigating effect to evidence the defendant had been abused as a child); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer … not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (footnotes omitted). The inclusion of additional questions regarding abuse-as-mitigation is necessary to ensure jurors are able and willing to consider such evidence.[4]

Mr. Smith seeks the Court's reconsideration of four of the twelve childhood-related questions he originally proposed:

> 49.    Do you believe the "abuse excuse" is used too frequently by people who have committed a violent offense in an effort to avoid responsibility for their criminal behavior?

---

[4] A prospective juror in *United States v. Brian Richardson,* No. 1:08-CRE-139-CC (N.D. Ga. 2012) provided a response about evidence of an abusive childhood that is fairly common:

Q. Okay. But an abusive childhood is certainly one, you consider that to be the abuse excuse?

A. What do you mean?

Q. Have you not heard that term?

A. Unh-unh.

Q. Okay. But an abusive childhood is not a factor that you would consider, give meaningful consideration to in deciding whether to impose life without the possibility of parole?

A. No. You can get out from under that. You don't have to stay in a home that you're treated that way.

February 27, 2012, voir dire TR at 119.

□Yes    □No

If yes, please explain:

_____
_____
_____

98. Do you believe that the personal circumstances, childhood and background of a defendant is relevant and should be taken into consideration in making a decision on whether to impose a sentence of life imprisonment without the possibility of release or the death penalty?[5]

□Yes  □No

Please explain your answer:

_____
_____
_____

99. What role, if any, do you believe childhood experiences play in a person's behavior and choices as an adult?

_____
_____
_____

A. In your view, should such information be considered when making a decision about the death penalty or life without the possibility of release?

□Yes   □No

Please explain your answer:

_____
_____
_____

---

[5] Mr. Smith has revised this question to omit reference to specific facts. *Compare* Dkt. 568-1 at 28 (Q. 98).

This question, or ones similar to it, are frequently asked of potential jurors in capital cases. *See* Dkt. 575 at 37 (*United States v. Con-Ui*, 3:13-cr-00123-ARC (M.D. Pa.)); *id.* at 234 (*United States v. Candelario-Santana*, 3:09-cr-00427-JAF (D. PR)); Dkt. 576 at 41 (*United States v. Williams*, 4:08-cr-00070-YK (M.D. Pa.)); *id.* at 107 (*United States v. Savage*, 07-cr-550 (E.D. Pa.)); *id.* at 187 (*United States v. Lujan*, 2:05-CR-00924-RB (D. NM)).

1    Mr. Smith also requests reconsideration of one of the four questions he proposed

2    related to juvenile incarceration. Dkt. 565-1 at 30-31 (Qs. 100-101 and 102(o), (p)). Mr.

3    Smith's incarceration as a child is a double-edged sword: it is both potentially mitigating

4    and aggravating. On the one hand, juvenile incarceration means ostracization and isolation

5    at a particularly vulnerable stage and potential victimization by others, among other things,

6    all of which can be mitigating. On the other, juvenile incarceration means that a person was

7    found guilty of crimes as a child, a fact the government has argued shows incorrigibility and

8    the potential of future danger. Dkt. 950.

9

10    To confirm that prospective jurors can consider the mitigating circumstances

11    surrounding juvenile incarceration[6] and will not improperly consider it in aggravation where

12    notice has not been given,[7]  and to allow the parties to intelligently exercise peremptory

13    challenges, the questionnaire must elicit prospective jurors' views on the role, if any,

14    juvenile incarceration plays in a person's behaviors and choices as an adult. Thus, Mr. Smith

15    asks the Court to reconsider its decision and include these questions:

16        100.    What role, if any, do you believe juvenile incarceration plays in a person's
17                behavior and choices as an adult?

18        _____

19        _____

20    _____

21    [6] *See* 18 U.S.C. §  3592(a)(8) (a juror "shall consider any mitigating factor, including…factors in  the  defendant's  background,  record,  or  character"). Questions regarding juvenile incarceration as mitigation are necessary to   determine early on which jurors will actually consider this evidence. And, of course, jurors are "not free to consider" juvenile incarceration, in and of itself, as a "factor[] in aggravation". *Defense Proposed Penalty Phase Instructions,* Dkt. 879-9 at 11.

24

25    [7] *See* 18  U.S.C. § 3592(c) (jury  may consider only those aggravating factors for which the government has given notice).

A.     In your view, should such information be considered when making a decision about the death penalty or life without the possibility of release?

□ Yes   □ No

Please explain your answer:

_____
_____
_____

**D. Questions Related to Knowledge and Opinions of Case.**

Mr. Smith asks that the Court to reconsider its decision to omit a follow up question regarding what opinions prospective jurors may have formed based on their exposure to outside information about this case. Dkt. 568-1 at 20 (Q. 72(A)). The Court's questionnaire includes the following question:

61.     Have you seen, heard, or read anything about this case apart from the Case Summary at the outset of this questionnaire?

_____Yes _____No

IF YES, please describe in detail what you have seen, heard, or read about this case:

_____
_____
_____

Mr. Smith requests that the Court follow up with this question:

A. Based on what you have seen, heard, read or learned, what opinions have you formed about this case?

_____
_____
_____

Ultimately, the purpose of asking prospective jurors about their exposure to pretrial publicity is to determine whether the exposure has biased the jurors against the defendant or

caused them to prejudge the defendant's guilt. *United States v. Tsarnaev*, 968 F.3d 24, 58 (1st Cir. 2020), cert. granted, No. 20-443, 2021 WL 1072279 (U.S. Mar. 22, 2021). While the Court's proposed question will elicit information regarding the jurors' exposure to media accounts of the case, the follow up question is necessary to elicit jurors' feelings and attitudes because of that exposure. *Cf. Silverthorne v. United States*, 400 F.2d 627, 637–38 (9th Cir. 1968) ("[W]hen pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused. The judge must insure that the voir dire examination of the jurors affords a fair determination that no prejudice has been fostered. … He must determine whether 'the nature and strength of the opinion formed (if any) are such as in law necessarily * * * raise the presumption of partiality.'"), *quoting Reynolds v. United States*, 98 U.S. 145, 156 (1878).

**E. Introduction to Questions About Sentencing.**

Mr. Smith requests that the Court include the following language after the third paragraph in the introduction to the questions about sentencing (Dkt. 771-1 at 23):

> Each juror must ultimately make a personal and reasoned moral decision about whether to sentence a defendant to life imprisonment without the possibility of release or to death. If, and only if, all twelve jurors unanimously find that death is the appropriate sentence for Mr. Smith, will a death sentence be imposed. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence, Mr. Smith will be sentenced to life imprisonment without the possibility of release.

Including this language serves several purposes. First, it reminds the prospective jurors that what we seek is their personal views on the death penalty and explains why that matters: because if selected they must make a personal decision whether or not to impose the death penalty. *See e.g., United States v. Sampson*, 335 F. Supp. 2d 166, 240 (D. Mass.

2004) (court informed jury of consequences of non-unanimity because this emphasized individual responsibility of each juror and ensured each was fully informed of consequences of its actions). Second, it provides the necessary context for Question 87 of the Court's questionnaire, which asks whether jurors can exercise that personal and reasoned moral authority. Dkt. 771-1 at 31 (Q. 87); *see also* Order Regarding Jury Instruction on Effect of Selection-Phase Unanimity, Dkt. 928 at 10 (noting  that informing the jurors of the consequences of deadlock emphasizes the individual responsibility of each juror and ensures that jurors are cognizant of this responsibility).[8]

## F. Questions Related to Death Penalty Views.

Mr. Smith asks the Court to reconsider, in part, its decision not to include his proposed questions regarding prospective jurors' view on the death penalty in a case such as this one. Dkt. 568-1 at 27-28 (Qs. 92-96 and 98). In his original questions, Mr. Smith included a summary of the allegations against him and asked for prospective jurors' views on the appropriateness of life without the possibility of release and the death penalty for such crimes. [*Id.*]

---

[8] *See* Defense Response to the Government's Jury Selection Briefing at Dkt. 571 and 572 (Dkt. 598 at 21) for an example of questioning that reveals a prospective juror's inability or unwillingness to exercise this personal, reasoned moral authority.

THE COURT: The law says we're going to take a different approach to this and everybody individually looks at these mitigating factors, these things that would mitigate toward a life sentence rather than a death sentence. You have to look at them personally. You have to give them serious consideration. And the question is, can you do that? If that's the way the law works and if that's what the law requires of you at that point, could you do that?

JUROR: No, I could not do it.

Mr. Smith asks the Court to include the following revised questions following Question 80 in the Court's questionnaire:

Q.    What are your views on the death penalty for a person who premeditated a home invasion robbery and intentionally killed two people, without any legal excuse or justification (e.g., not insane, not defending himself, and not acting under the heat of passion)?

Q.    What are your views of life imprisonment without the possibility of release, as opposed to the death penalty, for a person who premeditated a home invasion robbery and intentionally killed two people, without any legal excuse or justification (e.g., not insane, not defending himself, and not acting under the heat of passion)?

Q.    Could life without the possibility of release be a severe enough punishment for a defendant who premeditated a home invasion robbery and intentionally killed two people, without any legal excuse or justification?

Q.    If you were to find the defendant guilty of intentionally taking the life of more than one person, for you, is the death penalty is the only appropriate punishment?

Q.    Do you believe that the personal circumstances, childhood and background of a defendant is relevant and should be taken into consideration in making a decision on whether to impose a sentence of life imprisonment without the possibility of release or the death penalty?[9]

Such case-specific questioning in life- and death-qualifying prospective jurors is useful and appropriate. *United States v. Burgos Montes*, 2012 WL 1190191, *3 (D.P.R. Apr. 7, 2012) ("If properly formulated, case-specific questions may highlight juror bias. An example of such a question is a scenario in which a person would not consider any mitigating evidence in some circumstances, such as in the death of a child."); *United States v. Fell*, 372 F. Supp. 2d 766, 769-771 (D. Vt. 2005); *United States v. Johnson*, 366 F. Supp. 2d 822, 834-844, 848 (N.D. Iowa 2005). *See also United States v. Jones*, 2017 WL 10940489 (W.D. Mo.

---

[9] This question is also discussed on page 7, as it relates to questions related to jurors' views on childhood experiences as mitigation.

Aug. 28, 2017) (agreeing to case specific questioning on defendant's prior murder convictions and life sentence). The questions Mr. Smith proposed do not ask jurors to "stake-out" their position on the death penalty in a particular case, but rather "whether a juror will be able to fairly consider potential aggravating and mitigating evidence" if certain facts are present. *Fell*, 372 F. Supp. 2d at 771.

> If properly formed, case-specific questions help identify various forms of juror bias. For example, a juror might be excused for cause if he or she could not fairly consider the death penalty where the victim was involved in drug crimes. Similarly, a juror might be excused for cause if he or she would refuse to consider any mitigating evidence in a case involving the death of a child. Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438 U.S. 586, 604–05, 98 S. Ct. 2954, 57 L.Ed.2d 973 (1978).

*Id.* (some internal citations and footnote omitted).

### G. Replacing Defense Counsel's Name.

Question 59 of the Court's questionnaire include Steven Wells as defense counsel Dkt. 771 at 20. Mr. Smith requests that the Court substitute "Theresa Duncan" for Mr. Wells. *See* Dkt. 823 (appointing Ms. Duncan as substitute counsel).

### H. Questions Regarding a Defendant's Constitutional Rights.

Mr. Smith requests that the Court include questions related to jurors' views on the key constitutional rights implicated in a criminal trial, including a defendant's right to remain silent and the government's burden of proof. Questions like these are frequently included in special jury questionnaires to identify jurors who cannot or will not honor a criminal defendant's fundamental rights. *See, e.g.*, Dkt. 575 at 41-42 (*United States v. Jesse Con-Ui*,

3:13-cr-00123-ARC (M.D. Pa.)); *id.* at 74-75 (*United States v. Donald Fell*, 5:01-cr-00012-gwc (D. VT)); *id.* at 108 (*United States v. Gary Sampson*, 01–10384–MLW (D. Mass.); *id.* at 133 (*United States v. Gary Watland*, 11-cr-00038-JLK (D. Colo.); *id.* at 171-172 (*United States v. Naeem Williams*, 06–00079 DAE–LEK (D. Haw.).

Mr. Smith requests that the Court include the following in its special questionnaire:

Q:      If a defendant does not testify, the jury may not consider that fact, in any way, in reaching a decision. Do you think you might hold it against Mr. Smith if he did not testify?

❏ Yes ❏ No

a.      Please explain:

_____

Q:      Do you think if a person is brought to trial, there must be some truth to the charges and it is likely that the person is guilty under the law?

❏ Yes ❏ No

b.      Please explain:

_____

Q:      The judge will instruct you that the burden is on the prosecution to prove beyond a reasonable doubt that a defendant is guilty; the defense is never required to prove that he is innocent. If the government failed to prove the defendant's guilt beyond a reasonable doubt, would you be reluctant to return a verdict of not guilty?

❏ Yes ❏ No

c.      Please explain:

_____

## I.   Questions Regarding Current Political Climate and Respect.

As reflected in the rhetoric surrounding the last presidential election and the current debates over COVID-19 preventative measures, immigration and other polarizing topics, the

United States has become increasingly divided and its citizens increasingly intolerant of differing few points. *See, e.g.*, Carroll Doherty and Amina Dunn, "What Biden and Trump supporters tell us in their own words about America's political divisions," Pew Research Center (Dec. 17, 2020), available at https://www.pewresearch.org/fact-tank/2020/12/17/what-biden-and-trump-supporters-tell-us-in-their-own-words-about-americas-political-divisions/ (There is a "deep dislike that simmers among both Biden and Trump voters for those on the other side. Indeed, while the question was not intended to tap into partisan antipathy, some voters – nearly a quarter of each group – took the opportunity to criticize the opposing candidate and his supporters anyway. Explore the interactive yourself: There is no shortage of words like 'moron' and 'idiots' and phrases like 'hijacked by hate,' but these do not constitute the majority of statements from the voters who shared their views with us."); Susan Mulligan, "Democrats, Republicans and the New Politics of Hate: In a deeply divided nation, Democrats and Republicans don't just disagree, they hate each other," U.S. News & World Report (Oct. 21, 2019), available at https://www.usnews.com/news/elections/articles/2019-10-21/democrats-republicans-and-the-new-politics-of-hate.

This divisiveness is antithetical to the American jury system. Jurors must be able to discuss evidence, exchange views and opinions, and work together in an effort to reach a unanimous decision. *See* 9th Cir. Model Instruction 7.1 (Duty to Deliberate). During sentencing deliberations in a capital case, it is critical that jurors respect one another's views and do not bully those who disagree with them into abandoning their individualized moral decisions. Responsibility for sentencing a criminal defendant to death rests firmly with each juror. *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

In order to ensure the jurors who will decide Mr. Smith's fate are willing to and capable of fulfilling their duties to meaningfully deliberate and to respect their fellow jurors' moral decisions (even if they disagree with those decisions), the questionnaire should include a question that explores prospective jurors' feelings about differing opinions. Mr. Smith thus asks that the Court include the following question in the special questionnaire:

Q.      Do you feel that in our democratic society every individual is entitled to his or her opinion, and that differences in individual opinions should be respected?

❑ Yes ❑ No

Please explain:
_____

Q.      Do you hold any opinions, or believe others may have opinions that are so different from your own, that might influence your view of this case (e.g., opinions about crime, politics, race, prejudice, government, law enforcement, Black Lives Matter, Blue Lives Matter, Antifa, the "me too" movement, etc.)?

❑ Yes ❑ No

Please explain:
_____

**J.  COVID-19.**

Mr. Smith previously asked the Court to include several COVID-related questions in its hardship/eligibility questionnaire. Dkt. 991. The Court declined to adopt those questions, although it agreed to include one generalized question regarding hardship based on COVID-19 concerns.  Dkt. 999 at 4.

Mr. Smith respectfully requests that the Court include in the special questionnaire two of the COVID-related questions he previously proposed, Dkt. 991-2, and two additional questions.

| | |
|---|---|
| 1 | Q. Has the coronavirus pandemic created any worries, concerns or fears that would affect your ability to pay attention in court and/or be a fair and impartial juror in this case scheduled to begin in October? ❑ Yes ❑ No |
| 2 | |
| 3 | Please explain: _____ |
| 4 | |
| 5 | Q. Do you believe that you might feel pressure to reach a verdict quickly to avoid exposure to Covid-19 or that you would change your verdict or compromise with other jurors to deliberate faster to reduce your risk of exposure to Covid-19? ❑ Yes ❑ No |
| 6 | |
| 7 | |
| 8 | IF YES, please explain:_____ |
| 9 | Q. How, if at all, has the pandemic affected your thinking about the criminal justice system generally? |
| 10 | |
| 11 | Q. Have you, a family member, or someone close to you experienced any significant illness or losses due to the pandemic such as a life threatening Covid-19 related symptoms or death of a family member, significant other or close friend; or a loss of a job, home, relationship, etc.? ❑ Yes ❑ No |
| 12 | |
| 13 | |
| 14 | IF        YES,        please        explain        who        and        when: |
| 15 | _____ |
| 16 | These questions are necessary to elicit any COVID-related concerns that might affect |
| 17 | a juror's ability to pay attention to the evidence and to devote the time and consideration |
| 18 | necessary to reach a fair verdict. |
| 19 | **CONCLUSION** |
| 20 | Defendant John Pearl Smith respectfully asks the Court to make the foregoing |
| 21 | changes to the Court's Prospective Juror Questionnaire [Dkt. 771]. |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

DATED this 14th day of May 2021.

/s/Suzanne Lee Elliott
Law Office of Suzanne Lee Elliott
1300 Hoge Building
705 Second Avenue
Seattle, Washington 98104
Phone (206) 623-0291
Fax (206) 623-2186
Email: Suzanne-elliott@msn.com

/s/ Mark A. Larrañaga
Mark A. Larrañaga,
Walsh & Larrañaga
140 Lakeside Ave., Suite #338-A
Seattle, WA 98122
Phone: 206-972-0151
Mark@jamlegal.com

/s/ Theresa Duncan
Duncan Earnest, LLC
222 East Marcy Street
Suite 1
Santa Fe, NM 87501
505-710-6586
teri@duncanearnest.com

Attorneys for Defendant John P. Smith

| | |
|---|---|
| 1 | <u>Certificate of Service</u> |
| 2 | I certify that I electronically filed the |
| 3 | foregoing, and any attachments, with the Clerk of court for the U.S. District Court for the |
| 4 | District of Alaska by using the district's CM/ECF system on May 14, 2021. All |
| 5 | participants are registered CM/ECF users and will be served by the district's CM/ECF |
| 6 | system. |
| 7 | |
| 8 | <u>/s/ Theresa M. Duncan</u><br>Theresa M. Duncan |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

DEFENDANT'S MOTION TO MODIFY JURY QUESTIONNAIRE- 22

*U.S. v. SMITH*, NO. 3:16-CR-0086-SLG-DMS