S. LANE TUCKER
United States Attorney

KAREN E. VANDERGAW
A. JAMES KLUGMAN
CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Email: karen.vandergaw@usdoj.gov
Email: james.klugman@usdoj.gov
Email: christopher.schroeder@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN PEARL SMITH, II,<br><br>Defendant. | No. 3:16-cr-00086-SLG |

**SENTENCING MEMORANDUM**

The United States, by and through undersigned counsel, respectfully submits this Sentencing Memorandum in anticipation of the sentencing hearing scheduled for Wednesday, February 15, 2023, at 1:00 p.m. For the reasons set out in more detail below, the United States asks the Court to impose a sentence of life imprisonment.

# I. FACTUAL BACKGROUND

On March 10, 2006, John Pearl Smith appeared in superior court in Palmer for sentencing in five separate cases. Convicted of numerous crimes, including eight different felonies, including first-degree robbery, two first-degree burglaries, two first-degree vehicle thefts, second-degree theft, third-degree assault, and third-degree weapons misconduct, Smith was facing a potential maximum of up to 71 years in prison. See *Smith v. State*, 187 P.3d 511, 524 (Alaska App. 2008).

During that hearing, Superior Court Judge Beverly Cutler said that Smith's criminal record was "certainly one of the worst records that this Court has [seen] that doesn't include homicide or sexual assault." She then explained why she believed that only a long term of imprisonment could protect the public from Smith:

> The Court had already spent ... five years attempting rehabilitation and we attempted it in every single imaginable way. And we indulged over and over and over again in the very notions that [defense counsel] is arguing, for good reason. And that is that, you know, as a society, we would really far prefer not to be unduly punitive and to help people be more functional, so that we can all get along in the world together.
>
> ...
>
> I think society here—the criminal justice system in Alaska—the delinquency system in Alaska has tried every conceivable method of attempting [to help] you to help yourself…. When you do stuff like this, you end up getting locked up for a very long time, because that is all we can do to get [this] to stop happening, even though we've tried everything else.
>
> …
>
> And I certainly hope ... that—you know, by the time you are 30, 35—whatever, you will be more cognizant of what you need to do to control your behavior, so that you can live with other people without just grabbing what you want, doing things that impulsively you think, at the time, are either

funny, or… criminal and you could get away with it.... But I'm going to guess that you'll be 35 to 40 years old before you're really brought around, and maybe never.

She imposed a composite sentence of 20 years. Exh. 1 at 72.

Unfortunately, Judge Cutler's pessimism proved to be warranted. Smith was released on parole in April 2015. Immediately after his release, he began targeting victims he knew were involved in the drug trade for armed robberies, exploiting their reluctance to contact law enforcement. Smith had no qualms about using violence, fear, and intimidation against his victims, and as the jury found, he was willing to take the lives of two innocent people, and attempt to take the life of a third, to try to escape accountability for his conduct. Smith's repeated and calculated violent conduct has demonstrated that he cannot be trusted to remain among society for the remainder of his life.

### i.     The September 2015 robbery of M.B.

In prison, Smith met an inmate named "D.K." The two became close through a mentorship program and stayed in contact after both were released. Smith confided in D.K. about his plan to rob drug dealers. Smith told D.K. that he had a "Plan A," "Plan B," and "Plan C." Plan A was that if things went well—meaning that the victims complied in the robbery—Smith would leave without harming anyone. Plan B was that if the victims started resisting, Smith would use a little bit of force. Plan C was that Smith would murder the victims and burn down the building to eliminate any incriminating witnesses or evidence.

Smith and D.K. both knew a drug dealer named Tony Shivers, who lived in the Wasilla area. In 2015, Smith told his sister Jennifer that he wanted to rob Shivers and used

her laptop to look up Shivers' information online. Once he found Shivers' address, he had Jennifer to drive him to Shivers' home on Knik Goose Bay Road several times to scout the location.

At some point in September 2015, Smith asked his sister to pick him up and drive him to the home of Jesse Hoag, who was a friend of the Smith family. When they arrived, Smith got out of the car and told Hoag that he was going to rob a house. Hoag offered Smith weapons to commit the robbery. Smith left Hoag's residence with a backpack, two walkie talkies, a flashlight, gloves, and a mask. He again directed Jennifer to drive him to Knik Goose Bay Road, and then to park at a pull-off and wait there. Smith donned his mask and ran down the road. Jennifer stayed with the car to wait for him.

Unbeknownst to Smith, Tony Shivers had moved out of the home sometime earlier, and the current occupant was a 52-year-old man, "M.B." Smith ran up to the front door of the house and tried to kick the door in. The door did not budge, and Smith slipped and fell. He tried to kick the door in a second time and fell again. Eventually, he gave up and knocked. When M.B. answered the door, Smith rushed inside, armed with a Plumcrazy Firearms C15 rifle, forcing his way into the house. He fired a warning shot to frighten M.B. into compliance. He robbed M.B. of marijuana, several firearms and some jewelry. When he was finished, he ran back to the car, where Jennifer was waiting. He loaded the stolen items in the trunk and told her that the person he had robbed was not Tony Shivers.

Smith told Jennifer to drive him back to Jesse Hoag's residence, where he told Hoag that he had robbed a house with a marijuana grow operation. Smith burned the shoes he

was wearing during the robbery in a burn barrel behind Hoag's house and left behind some of the items stolen from M.B. that he did not want.

Smith later told D.K. about the robbery at Tony Shivers' house, confirming that he had staked out the property ahead of time, that he had tried to kick open the front door, and that he had slipped on some ice on the porch. He further described restraining the occupant at gunpoint and admitted stealing both marijuana and money.

### ii. The May 11, 2016, robbery of R.H.

In 2016, Smith's friends Megan Soczka and her boyfriend Jacob Wodkowski lived in a home on Alvin's Alley in Wasilla. "R.H." moved into the lower floor of the house in the late winter or early spring. R.H. sold drugs, including marijuana, methamphetamine, and heroin, out of the house. Smith also came over to the house regularly to visit his friends, and came into contact with R.H. in the process. When Smith learned that R.H. was a drug dealer, he made a comment to the others about robbing her.

Smith chose the night of May 11, 2016, for the robbery. That night, one of R.H.'s friend, "J.L.," was trying to fall asleep on the couch on the lower level outside R.H.'s room. Smith burst through the door wearing a ski mask and pointed an assault rifle in J.L.'s face. J.L. asked if the rifle was real; Smith confirmed that it was. Smith threw J.L. a roll of duct tape and said, "You know what to do with that." J.L. used the duct tape to bind his ankles and wrists together.

J.L. asked if this was "business" or "personal." Smith responded that it was business. He told J.L., "You don't want to get shot, people get shot every day." Smith also said that

he had been hiding out in the woods for three days watching them, which was how he knew the house on Alvin's Alley was a drug house.

Smith moved behind J.L. and directed him to knock on R.H.'s bedroom door. He told J.L. that if he had to shoot anyone, he would kill everyone in the house. R.H. opened the door and saw Smith behind J.L., holding the rifle. Smith pushed J.L. into the bedroom and ordered R.H. to tie herself up with duct tape. He forced the two of them to lie down and began to question R.H. about the location of her "stash". R.H. directed him to some drugs that were out in open in the bedroom. Smith said, "This isn't it." R.H. told him that the rest was in the safe next to the bed.

Smith directed her to open the safe. As soon as she opened it, he told her to back away. He looked inside the safe and saw a .22 caliber 9-shot Astra Cadix revolver. He became angry and accused R.H. of trying to trick him to get access to a gun. R.H. tried to convince Smith that she had forgotten that the revolver was in the safe. Smith picked up the gun and said, "Don't be surprised if this revolver is used in a murder in the next couple weeks." He implied that R.H. would be blamed for the murder because her fingerprints were on the weapon. He stole the remaining items from the safe—a few hundred dollars and a small amount of heroin—and complained that he had expected more. He told the victims not to move for 15 minutes and left.

R.H. immediately suspected that the robber was Smith, based on his build, his mannerisms, and the way he carried himself. She went upstairs to Soczka and Wodkowski's room and woke them, crying that Smith had just robbed her.

After the robbery, Smith asked D.K. to sell the stolen heroin for him. He told D.K. about the robbery, including the fact that he had staked out the residence beforehand. He was concerned that R.H. could have recognized his voice and did not want her stolen heroin to be traced back to him. D.K. did not want to be involved in the drug deal and declined.

### iii.    The June 5, 2016, robbery and murders of Ben Gross and Crystal Denardi.

Ben Gross was a commercial fisherman who owned property Cloudy Lake in the Meadow Lakes community. Following challenges in his personal life, he began using hard drugs. By June 2016, Gross was living in a large, detached garage and shop on the property. Gross was known in the community as someone who used drugs, and who would often share his drugs with friends when they came to visit.

On the night of June 4, 2016, Gross and his friend "R.B." left Gross's residence in R.B.'s van to pick up a young woman named Crystal Denardi. On their way back, they stopped at a Tesoro gas station on Pittman Road, where R.B. met a woman he knew and purchased a quarter gram of heroin from her for $40.00. The three of them got back into R.B.'s van and drove back to Gross's shop, where they started smoking the heroin.

Shortly after 11:00 that night, Smith texted his girlfriend Cassie Schaeffer asking if she wanted to help him for two to three hours. Smith arrived at Schaeffer's house around midnight and asked her to drive him somewhere. He told her to turn off her cell phone. At Smith's direction, she drove him to the edge of Gross's property on West Coal Road and dropped him off. He told her to come back in half an hour.

Smith walked through the woods to Gross's shop, armed with the .22 caliber 9-shot Astra Cadix revolver he had stolen from R.H. three weeks earlier. R.B. heard a loud crash and two gunshots as Smith burst into the shop, yelling, "Get 'em up motherfuckers." Gross stood up and threw a beer bottle at Smith. Smith fired three more shots, striking Gross in the left abdomen, the base of the left side of his neck, and in the face. Gross fell to the ground. R.B., in shock, yelled at Smith to stop and begged him not to shoot. Smith calmly walked over to where Gross's body had fallen and shot him a fourth time in the back of the head. Smith looked at R.B. and Denardi and bragged, "That's 27. Now, where is the safe?"

R.B. insisted that there was no safe. Smith said, "Where's the money?" and "I heard this guy is rich." R.B. responded, "He's not rich. He's a fisherman." Smith responded, "Your friend died for nothing."

Smith asked where the drugs were. R.B. pointed to what was left of the quarter gram of heroin the three had been smoking, which was on a piece of tin foil on a coffee table in the corner. Smith took R.B. and Denardi's cell phones, and went through R.B.'s wallet and Denardi's purse looking for drugs or money.

At that point, Smith thought he heard a noise outside. He told R.B. and Denardi to stand up, put their hands behind their heads, and slowly walk to the door of the shop to look outside. R.B. told him there was no one outside, but that two other friends who had been there earlier in the night were supposed to return soon. Smith told them to walk back to where they were. As the two of them walked back towards the corner of the shop, Smith shot Denardi in the back of the head, killing her.

R.B. heard the gunshot from behind him and realized that Smith intended to kill all of the potential witnesses. He took off running around the back of a Jeep that was parked in the back corner, begging Smith, "No, don't do this. I got kids." Smith responded, "So do I," and fired a shot at R.B. The bullet grazed the left side of R.B.'s chest as he ran. R.B. fell to the ground. As he tried to get up, Smith shot him a second time in the back of the head. The second bullet also grazed off R.B.'s head without penetrating his skull.

R.B. got up and ran outside towards Cloudy Lake. Smith followed him down to the shore and raised the gun to point it at R.B.'s head. R.B. grabbed the gun, shoved Smith backwards, and then dove into the lake. He tried to swim away but did not get far. He surfaced and continued to beg Smith not to kill him from the water. Smith said, "Well, swim, motherfucker. You just might live." Smith turned and walked away back towards the shop. R.B. swam back to the shore and got into a kayak. He paddled across the lake and went to the nearest house, where he frantically asked the homeowner to call the police.

Smith went back to the shop, poured gasoline on the crime scene and on Gross and Denardi's bodies, and set the building on fire. When Cassie Schaeffer returned to the rendezvous point as she had been directed, Smith emerged from the woods and got into the passenger seat. He directed her to drive down Johnson Road and stop at an ATV trail. He got out, walked down the trail, and buried the revolver in the mud in a small hole under a tree.

The next day, Megan Soczka told Smith that she had heard that Ben Gross had been killed and that R.B. was in the hospital. Smith seemed concerned about R.B. and asked her repeatedly if she knew whether R.B. was going to survive.

### iv. Smith's attempts to eliminate witnesses and escape from custody.

In the days and weeks following the murder, Smith talked to D.K. about crime, telling D.K. that he robbed Gross because he believed there would be drugs there. He described Denardi getting on her knees and shooting her in the head. He also said that he was concerned that Megan Soczka would "turn evidence on him" and said he was "willing to take her out."

Smith was arrested on federal charges for felon in possession of a firearm later that summer and has been incarcerated ever since. During his detention, he boasted to at least four different inmates about the robbery and murders he had committed.

While in the Anchorage Correctional Complex, Smith told inmate "J.H." that his girlfriend Cassie had driven him to the scene on the night of the murders. He described how he shot Crystal Denardi in the back of the head "and she fell on the ground like a rag doll." Afterwards, he described how Schaeffer helped him dispose of the shell casings from the gun he had used in the murders. Smith also talked about a plan to break a window and escape from jail during a shift change and asked J.H. to help facilitate travel into Mexico.

While in Anchorage, Smith also told inmate "B.L." about the murders, including that he had shot one witness in the chest and in the head, and then set the shop on fire. He appeared nervous that the witness was still alive. After B.L. was released, he stayed in

contact with Smith. Smith asked him to contact R.B. to send him a message and "get rid of him," then to help frame someone else for the crime. Smith also talked about escaping from jail during a prisoner transfer to and from court, when jail staff would be less alert.

Smith also confided in "G.C.", a longtime friend. Smith described to G.C. how he had murdered Gross and Denardi and tried to murder R.B., and also told him where he had hidden the murder weapon. He told G.C. to drive to that location once he was released, retrieve the revolver, and plant it on Gross's friend Travis Peck to frame Peck for the murders. G.C. told law enforcement about Smith's request. Investigators drove to the ATV trail off Johnson Road, walked down the trail, and were able to recover the .22 caliber 9-shot Astra Cadix revolver from where Smith buried it the night of the murders:



Carvalho also provided investigators with a map Smith drew for him in jail describing where to find the gun:



A forensic analyst subsequently confirmed that the handwriting on the map was Smith's.

After he was moved to FDC SeaTac, Smith told inmate "J.R." that he had killed a man and a woman in a robbery. He explained that his victims were "undesirables" and said that the prosecution had no witnesses and no evidence because he burned it all.

## II. CHARGES AND CONVICTIONS

Smith proceeded to a jury trial that began on August 8, 2022. After an 11-day trial, the jury found Smith guilty of all ten counts:

| Count | Offense | Statute | Date | Maximum |
|-------|---------|---------|------|---------|
| 1 | Attempted Interference with Commerce by Robbery | 18 U.S.C. § 1951(a) | June 5, 2016 Ben Gross Robbery | 20 years |
| 2 | Attempted Possession of Controlled Substances with Intent to Distribute | 21 U.S.C. §§ 846 and 841(b)(1)(C) | | 20 years |
| 7 | Use of a Firearm to Commit Murder of Ben Gross in Relation to a Drug Trafficking Crime | 18 U.S.C. § 924 (c)(1), (j)(1) | | Life |
| 8 | Use of a Firearm to Commit Murder of Crystal Denardi in Relation to a Drug Trafficking Crime | 18 U.S.C. § 924 (c)(1), (j)(1) | | Life |
| 9 | Interference with Commerce by Robbery | 18 U.S.C. § 1951(a) | May 11, 2016 R.H. Robbery | 20 years |
| 10 | Attempted Possession of Controlled Substances with Intent to Distribute | 21 U.S.C. §§ 846 and 841(b)(1)(C) | | 20 years |
| 12 | Use of a Firearm in Relation to a Drug Trafficking Crime | 18 U.S.C. § 924 (c)(1)(A) | | Life |
| 13 | Interference with Commerce by Robbery | 18 U.S.C. § 1951(a) | Sept. 2015 M.B. Robbery | 20 years |
| 14 | Attempted Possession of Controlled Substances with Intent to Distribute | 21 U.S.C. §§ 846 and 841(b)(1)(C) | | 20 years |
| 16 | Use of a Firearm in Relation to a Drug Trafficking Crime | 18 U.S.C. § 924 (c)(1)(A) | | Life |

## III.    SENTENCING CALCULATIONS

Counts 1, 2, and 7 are grouped for guideline calculation purposes because they all relate to the murder of Ben Gross The base offense level for a violation of 18 U.S.C. § 924(j) involving first-degree murder is 43. PSR at ¶ 24. The probation officer added a two-level enhancement for obstruction of justice because Smith tried to burn down the crime scene, frame someone else for the murders, and escape before trial. PSR at ¶ 28. The adjusted offense level was 45.

The adjusted offense levels for the other groups of counts were as follows:

- Count Group 2 (the robbery of R.H.)—30

- Count Group 3 (the robbery of M.B.)—30

- Count 8 (the murder of Crystal Denardi)—45.

Applying the multiple count adjustment, Smith received an additional one unit for the group with the highest offense level, and another unit for each group that was equally serious or within 1-4 levels as the highest group. PSR at ¶ 52. Count Group 1 and Count 8, which both had adjusted offense levels of 45, thus received an additional one point each, which were added to the adjusted offense level for a combined adjusted offense level of 47. PSR at ¶¶ 52-55.

Under the guidelines, "[a]n offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Part A, application note 2. Because Smith effectively exceeded the maximum sentencing guideline, the total offense level was treated as 43. With an offense level of 43, and a Criminal History Category of VI, the guideline range was life.

## IV. OBJECTIONS TO THE PRESENTENCE REPORT

Smith should receive two additional criminal history points pursuant to USSG §4A1.1(d) for committing his offenses while on parole. These additional points will increase his criminal history category to VI.

Smith submitted several objections, almost all of which are based on the premise that the PSR should only include information presented at trial. But "[d]ue process of law does not limit the contents of a pre-sentence report to information which would be admissible under rules of evidence applicable to the trial." *Taylor v. United States*, 179 F.2d 640, 642-43 (9th Cir. 1950) (internal citation omitted). The purpose of a PSR is to "provide the trial judge with as much information as possible in order to enable the judge to make an informed decision." *United States v. Belgard*, 894 F.2d 1092, 1097 (9th Cir. 1990). To that end, 18 U.S.C. § 3661 provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also Williams v. New York*, 337 U.S. 241, 247 (1949) (describing the "fullest information possible concerning the defendant's life and characteristics" as "highly relevant—if not essential" to a court's determination at sentencing). The government agrees with the PSR writer that, to the extent factual assertions in the report go beyond the scope of the trial testimony, those claims are adequately supported by reliable evidence.

## V. APPLICATION OF THE 18 U.S.C § 3553 SENTENCING FACTORS

The government submits that only a sentence of life imprisonment is sufficient to satisfy the statutory criteria.

### a. *The nature and circumstances of the offenses*

John Pearl Smith willfully and intentionally murdered two innocent victims. He did so for no reason beyond shielding himself from apprehension for a string of armed robberies. He acted with premeditation and malice aforethought: indeed, even before selecting an individual victim to target, he had committed himself to killing everyone who might refuse to submit to his commands. He hunted for victims involved in the drug trade because he believed they would be unwilling to report his crimes, and because he considered them to be unworthy of the protections of the law. He hid outside their houses and watched for days ahead of time. He shot Ben Gross three times as Gross tried to defend himself, then stood over him and fired a fourth shot into Gross's head while boasting of his kill count. He then shot Crystal Denardi—unarmed, defenseless, and with her back turned—in the back of the head to eliminate any witnesses. For no reason beyond his own selfish greed, he condemned their friends and families to live with the trauma and heartbreak of having a loved one taken from them in a senseless act of violence.

Despite his expressed willingness to do so, Smith did not take the lives of all his victims, and those survivors must also now live with the consequences of his actions. Survivors of violent crime experience severe and sometimes life-altering repercussions from the experience at home, at school, and at work. According to a 2014 study by the Department of Justice, 96% of victims of serious violence (defined as rape or sexual assault, robbery, and

aggravated assault) were still experiencing psychological symptoms a month after the crime. U.S. Department of Justice, Bureau of Justice Statistics, NCJ 247076, *Socio-Emotional Impact of Violent Crime*, 3-4 at Table 1 (Sept. 2014), available at https://bjs.ojp.gov/content/pub/pdf/sivc.pdf. These symptoms included feeling worried or anxious (78%), angry (76%), unsafe (73%), violated (69%), vulnerable (64%), distrustful of others (64%), and sad or depressed (58%). *Id*. 67% of victims also reported physical symptoms, including trouble sleeping (51%), fatigue (36%), and problems eating and drinking (33%). *Id*.

The four victims who survived Smith's robbery spree—R.B., R.H., J.L., and M.B.—had to live with the emotional and physical effects of what Smith did to them. Three of them live with it still. The toll that being the victim of a violent crime takes on a human being, causing them to live in fear, circumscribe their own lives, and inflicting untold psychological damage, is a significant factor the Court should take into account. Smith bears sole responsibility for all those harms as well. The nature and circumstances of these offenses are as severe as this Court will ever see.

### b. *The history and characteristics of the defendant*

Smith's personal history and characteristics further demonstrate that his prospects for rehabilitation is minimal, and that he will likely continue to remain a danger to the public for the rest of his life. His mother described his childhood as "free from abuse or neglect." PSR at ¶ 94. His sister described their upbringing as "fairly unremarkable" and was unaware of any "standout issues or traumas". *Id.* He got along well with his father, and they often hunted

together. PSR at ¶ 95. Even as a child, Smith was regularly in trouble for stealing or bullying. PSR at ¶ 93. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

As Smith grew older, his anti-social criminal conduct escalated. He spent much of his youth in detention centers following a series of 10 juvenile delinquency adjudications. PSR at ¶¶ 66-75. At the age of 14, Smith and another juvenile attacked a youth counselor and escaped. PSR at ¶ 74. Smith directed the other boy to "choke her, choke her out," while he held the victim's legs. The counselor eventually surrendered her keys to Smith, who used them to remove his restraints and flee. Smith was arrested several days later after committing a series of burglaries and firearms thefts. *Id.* He escaped from custody a second time in 2002 while on an approved hike. PSR at ¶ 75. When he was arrested that time, he pulled a knife on the arresting officer. PSR at ¶ 88. And shortly after becoming an adult, Smith committed the burglaries, robberies, and weapons offenses for which Judge Cutler sentenced him to 20 years. Smith's background also demonstrates that he lacks any respect for the law, as proven by his repeated history of attempting to escape from custody.

In 2005, when Smith was 19, his father died, supposedly of a drug overdose. PSR ¶¶ 92, 97. After his death, Smith repeatedly expressed an extreme hatred of drug addicts and realized that "their drug use left them open to exploitation". PSR at ¶ 97. Following his release Smith systematically victimized drug addicts throughout the Matanuska-Susitna Valley, flaunting his deeds to his friends and bragging that he would escape the consequences

of his actions because his victims could not turn to law enforcement.

Smith's conduct after his arrest should also be an aggravating factor in the Court's analysis. He talked repeatedly about escaping from jail before trial. He tried to convince Gordon Carvalho to plant the murder weapon on an innocent man to frame him for the murders. As recently as June 2022, shortly before trial was to begin, Smith tried to escape from jail again. Staff at FDC SeaTac found numerous bedsheets in Smith's locker—long enough to tie together to reach the ground outside his window—along with flight plans and a diagram of a runway at the nearby airport. PSR at ¶ 65. In short, Smith has proven throughout his life that he is a violent and remorseless killer, and nothing in his history suggests that he will change or reform.

An additional point about Smith's father's death warrants discussion. In 2005, while Smith was awaiting trial on his five state felony cases, "the superior court granted his request for a one-day release from custody so that he could attend his father's funeral…. The court directed Smith to return to custody by nine o'clock that evening. Approximately thirty minutes before this deadline, Smith cut off the ankle bracelet that monitored his geographic position, and he then absconded." *Smith*, 187 P.3d at 523. One week later, Smith broke into a home and stole two firearms. *Id.* The state fugitive task force tracked him to a residence in Wasilla, where he surrendered after a standoff. *Id.* It is difficult to conceive of a more cynical attempt to manipulate the justice system than the fact that Smith "used the death of his father to facilitate his escape from custody." *Id.* at 525.

### c. *The need to reflect the seriousness of the offense and promote respect for the law.*

The Sentencing Commission considers murder so heinous an offense that the guidelines recommend a life sentence even when the defendant has no prior arrests or convictions. *See* U.S.S.G. §§ 2A1.1 (establishing the base offense level for murder as 43 regardless of Criminal History Category). Smith committed two murders and did everything in his power to commit a third. He did shortly after his release from a sentence for eight other serious felonies. Any punishment short of life in prison that would inadequately reflect the seriousness of these offenses.

### d. *The need to afford adequate deterrence.*

Smith's decision to continue to engage in criminal conduct—including the obstructive conduct after his arrest in this case—suggests that no sentence the Court can impose will deter him personally. But general deterrence deserves some weight in the Court's analysis. This case has received considerable attention over the years. And given that the outcome of this case is likely to be widely disseminated, the sentence that this Court imposes, and the message this Court chooses to send at the sentencing hearing, will reverberate among the community. When Congress first enacted § 924(c) as part of the Gun Control Act of 1968, its sponsor, Representative Richard Poff, said that the goal was to "persuade the man who is tempted to commit a federal felony to leave his gun at home." *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (citing 114 Cong. Rec. 22231 (1968)). A sentence of life imprisonment, widely disseminated through the state, is more likely to deter others tempted to steal from innocent victims from carrying, brandishing, and using firearms.

### e. The need to protect the public from further crimes.

Incapacitation is also an essential function of the sentence here. There seems to be little point to discussing the likelihood of recidivism for a defendant who, after serving nine years in prison, embarked upon a spree of armed robberies that culminated in him murdering two innocent people and trying to murder a third. Smith has proven that, for him, no punishment will deter him from continuing to rob drug dealers for a living. The only way this Court can adequately protect the public from Smith is to order that he spend the rest of his life in prison.

### f. The need to avoid unwarranted sentence disparities.

The PSR notes that the average nationwide sentence over the past five years for defendants whose primary guideline was § 2A1.1 (first degree murder), with a Final Offense Level of 43 and a Criminal History Category of V, was 379 months. PSR at p. 3, ¶ 9. But this case involves two murders, along with an attempted murder, and three armed robberies. Here, the specific facts of this case are more informative than a statistical average based solely on a reference to the general sentencing guideline. And under these specific facts, a life sentence is the only appropriate punishment.

//

//

//

//

//

In this district, the government is aware of the following homicide cases in which the primary sentencing guideline was § 2A1.1:

| **Defendant** | **Case No.** | **Sentence** | **Date of IOS** |
|---|---|---|---|
| Raymond Cheely | 3:92-cr-00073-JKS | Life | 7/13/1995 |
| Abram Walter | 4:96-cr-00026-HRH | Life | 7/25/1997 |
| Ronald Geiger | 3:96-cr-00108-JWS | Life | 11/5/1997 |
| Joshua Wade | 3:07-cr-00111-RRB | Life | 2/22/2010 |
| Javier Martinez | 3:11-cr-00103-RRB | 780 months[1] | 12/16/2014 |
| James Wells | 3:13-cr-00008-SLG | Life | 1/14/2020 |
| Filthy Fuhrer | 3:19-cr-00026-1-TMB | Life | 1/24/2023 |
| Roy Naughton | 3:19-cr-00026-2-TMB | Life | 1/24/2023 |
| Glen Baldwin | 3:19-cr-00026-3-TMB | Life | 1/25/2023 |
| Colter O'Dell | 3:19-cr-00026-4-TMB | Life | 1/25/2023 |
| Craig King | 3:19-cr-00026-5-TMB | Life | 1/26/2023 |

A within-Guidelines sentence of life imprisonment will not result in any unwarranted sentencing disparities between Smith and similarly situated defendants.

### g. *The need to provide restitution to any victims.*

The government will not be seeking any restitution in this case.

---

[1] Javier Martinez was convicted at trial of, among other things, possession of a firearm by an illegal alien. Martinez used that firearm to murder his boss at the Millennium Alaskan Hotel in Anchorage in 2011. He was sentenced to 65 years in his federal case, consecutive to a 99-year sentence in state court for the murder, so it would perhaps be more accurate to think of this as a life sentence.

## VI. BOP PLACEMENT

Finally, the government requests that this Court not make a recommendation as to which facility Smith will be placed. Smith is an extreme security risk, who has tried to escape multiple times from multiple institutions. The Bureau of Prisons is best situated to determine his placement in a way that will minimize institutional security risks and Smith's ability to engage in continued criminal activity. To the extent the Court believes a recommendation is appropriate, the Government suggests the Administrative Maximum Facility at USP Florence.

## VII. CONCLUSION

Smith has spent most of his life victimizing the public through an escalating series of violent crimes. The Court should ensure that the victims in this case are the last, and impose a sentence of life imprisonment.

RESPECTFULLY SUBMITTED February 8, 2023, in Anchorage, Alaska.

> S. LANE TUCKER
> United States Attorney
>
> *s/ Karen E. Vandergaw*
> KAREN E. VANDERGAW
> Assistant U.S. Attorney
>
> *s/ A. James Klugman*
> A. JAMES KLUGMAN
> Assistant U.S. Attorney
>
> *s/ Christopher D. Schroeder*
> CHRISTOPHER D. SCHROEDER
> Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2023, a copy of the foregoing was served via the CM/ECF system on:

Mark Larrañaga
Suzanne Lee Elliott
Theresa M. Duncan

*s/ Christopher D. Schroeder*
Office of the U.S. Attorneys